**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | |
| ) | |
| In re Aratana Therapeutics Inc. Securities ) | **Case No. 17 Cv. 880 (PAE)** |
| Litigation ) | |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| ) | |
| ) | |
| ) | |

**AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................- 1 -

JURISDICTION AND VENUE .........................................................................................- 5 -

PARTIES ...............................................................................................................................6

    I.    Lead Plaintiffs ......................................................................................................6

    II.   Defendants .........................................................................................................- 6 -

BACKGROUND .....................................................................................................................8

    I.    Aratana's Business ...............................................................................................8

        A.     Aratana Targets Novel Therapies to Treat Serious Medical Conditions in Pets ......8

        B.     Pet Therapeutics is a $20 Billion Untapped Market ...............................................12

    II.  FDA Regulations Regarding Pet Drugs Manufacturing Requirements......................- 12 -

    III.  ENTYCE ..........................................................................................................- 15 -

    IV.  In Order to Obtain Desperately Needed Liquidity to Fund New Drug
          Development, Aratana Enters into A Loan Agreement That Requires the
          Company to Quintuple the Number of FDA-Approved Products Within a Year .- 16 -

    V.   Aratana Rushes the Approval of ENTYCE in Order to Comply with the Loan
          Agreement and Extend Interest-Only Payments ...................................................- 18 -

    VI.  Defendants Conceal from Investors that Aratana is Unable to Find a
          Manufacturer/Supplier in Time to Commercialize ENTYCE in 2016.................- 20 -

    VII. The FDA Informs Aratana its Manufacturing Facilities are Insufficient to Satisfy
          Regulations .........................................................................................................- 22 -

MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE
CLASS PERIOD....................................................................................................................- 23 -

    I.    Materially False and Misleading Statements Regarding Aratana's Ability to
          Successfully Manufacture and Sell ENTYCE on a Commercial Scale ................- 23 -

    II.  Defendants' Materially False and Misleading Statements Regarding Compliance
          with FDA Regulations ........................................................................................- 39 -

    III.  Risk Disclosures Inadequate Because Risk Materialized or Insufficiently Specific..- 41 -

THE TRUTH IS REVEALED...............................................................................................- 46 -

I.    Defendants Announce Commercialization of ENTYCE is Delayed for Over One
      Year .......................................................................................................................- 46 -

II.   Aratana is Forced to Write-Off ENTYCE Inventory Due to Manufacturing Delays - 47 -

POST-CLASS PERIOD EVENTS ...........................................................................................- 49 -

ADDITIONAL SCIENTER ALLEGATIONS .........................................................................- 51 -

I.    The Individual Defendants Knowingly and Recklessly Misrepresented the
      Company's Ability to Commercially Launch ENTYCE and Time to Market......- 52 -

      A.    Inconspicuously Changed Timeline for ENTYCE Commercialization...............- 52 -

      B.    ENTYCE Comprises Over Half of Aratana's Future Revenues .........................- 55 -

      C.    Defendants Were Not in Compliance with FDA Regulations .............................- 55 -

II.   The Individual Defendants Had Motive to Commit the Alleged Fraud and Conceal
      the Company's Inability to Commercially Launch ENTYCE from Investors......- 57 -

      A.    The Individual Defendants Had Motive to Commit the Alleged Fraud to Sell
            Off Large Blocks of Their Personal Holdings of Aratana Securities .................- 57 -

      B.    The Individual Defendants Had Motive to Commit the Alleged Fraud to Avoid
            Interest Payments Under the Credit Agreement/Loan Agreement .....................- 61 -

      C.    The Individual Defendants Had Motive to Commit the Alleged Fraud to Ensure
            the Success of the Company's October 2015 Public Offering ...........................- 62 -

LOSS CAUSATION...................................................................................................................- 63 -

CLASS ACTION ALLEGATIONS ..........................................................................................- 66 -

NO STATUTORY SAFE HARBOR.........................................................................................- 67 -

APPLICABILITY OF FRAUD-ON-THE-MARKET...............................................................- 68 -

COUNT I ...................................................................................................................................- 69 -

COUNT II ..................................................................................................................................- 72 -

PRAYER FOR RELIEF ............................................................................................................- 73 -

DEMAND FOR TRIAL BY JURY ...........................................................................................- 74 -

Court-appointed Lead Plaintiffs Joseph Bessent, John Corbitt, and Eric Pearson (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of: (i) public documents, conference calls and announcements made by Defendants Aratana Therapeutics, Inc. ("Aratana" or the "Company"), Steven St. Peter ("St. Peter"), and Craig A. Tooman ("Tooman," collectively with Aratana and St. Peter, "Defendants"); (ii) the Defendants' United States Securities and Exchange Commission ("SEC") filings; (iii) wire and press releases published by and regarding Aratana's analysts' reports and advisories about the Company; (iv) consultations with Plaintiffs' experts; and (v) information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This class action is brought on behalf of a class (the "Class") consisting of all persons other than Defendants who purchased or otherwise acquired Aratana securities between March 16, 2015 and March 13, 2017, inclusive (the "Class Period"). Plaintiffs seek to recover damages on behalf of the Class caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its executive management.

2.    Founded in 2010, Aratana is a development-stage biopharmaceutical company that develops biomedical therapeutics for animals. The Company focuses on developing products to treat pain and inflammation associated with serious medical conditions in pets. One of the

Company's key products is ENTYCE, also known as AT-002 (capromorelin oral solution), an appetite stimulant for dogs.  The market for ENTYCE is estimated at approximately $50-$100 million.

3.      Aratana admittedly "lack[s] the resources and capability to manufacture any of our therapeutic candidates on a scale necessary for commercialization."  Thus, the Company is forced to utilize third-party suppliers and manufacturers who supply active pharmaceutical ingredients ("API") drug product and packaged product for the development and commercialization of the Company's small molecule product candidates.

4.      At the beginning of the Class Period, with only one product on the market generating less than $1 million in revenue per year, Aratana was in desperate need of liquidity to continue funding the development of ENTYCE and other pipeline drugs. Thus, on or about October 16, 2015, Aratana entered into a Loan and Security Agreement (the "Loan Agreement") consisting of a $35 million term loan and $5 million revolving credit line.  For the first eighteen months of the Loan Agreement, Aratana was only required to make interest payments of approximately $201,000 per month, or $2.4 million per year.  If the Company did not obtain full U.S. Food and Drug Administration ("FDA") approval for at least four new drugs and conditional approval of a fifth new drug in 2016, it would be required to start making principal and interest payments of approximately $941,000 per month, or $11.3 million per year, nearly five times more per annually starting in May 2017. If Aratana did receive the requisite FDA approval, the Company could defer principal payments for another year to May 2018.  Thus, with less than $10 million in cash on the balance sheet, Aratana's ability to defer another twelve months of principal payments while the Company ramped up its drug approval and revenue stream was critical to its future viability.

5.     Thus, Defendants rushed to market with six new drug products, including ENTCYE, despite the fact Aratana did not have the capabilities in place to commercially launch ENTYCE, and disregarded the fact that the Company lacked the means to commercially produce ENTYCE according to the timeline it proposed, if at all.

6.     Throughout the Class Period, Defendants falsely represented that Aratana was ***"very much on track"*** to commercially launch ENTYCE by "mid-2016," that the Company was (as of March 2016) "***currently transferring the manufacturing technology process*** for . . . ENTYCE ***and scale-up required for commercialization***" such that Defendants "believe[d] we have or will have sufficient supply of formulated drugs to meet our commercial forecast" and, thus, Aratana had "commenced the process of hiring the sales organization." (Emphasis added).

7.     When asked by analysts and investors about the timeline to commercialize ENTYCE, Defendants refused to provide any information, stating "we are not prepared today to lay that out." In reality, Defendants lack of information surrounding these issues was due to the fact there were no additional details to share since the Company did not have a current plan in place to commercialize ENTYCE

8.     Defendants knew that, contrary to their public statements, Aratana did not even have the internal capability or a commercial partner to produce ENTYCE on a commercial scale, let alone by the timeline it told investors, if at all.  Defendants' inability to find a way to manufacture ENTYCE on a commercial scale has caused Aratana to delay its commercial launch at least three times extending more than eighteen months.

9.     By the time the Company had a possible, ***still undisclosed*** purported plan in place to commercially produce ENTYCE, it was forced to write off expired inventory totaling $15.1 million for 2016.  Moreover, since the FDA considers any change in manufacturing a "major

change," Aratana is required to obtain approval for the proposed new process and facility before it can start selling ENTYCE.  There is no guarantee when, if ever, Aratana will receive FDA approval for the commercial manufacturing of ENTYCE.

10.     Investors would ultimately learn the truth on February 6, 2017, when Defendants revealed that the FDA was requesting additional information on the Company's request to transfer the commercialization of ENTYCE to a new vendor and that Aratana was, now, forced to delay the commercial launch of ENTYCE for another year until "***late-2017***."

11.     As Defendants disclosed, on February 2, 2017, the Company received a response from the FDA's Center for Veterinary Medicine ("CVM") in connection with the Company's post-approval supplement request to transfer the manufacturing of ENTYCE® to a new vendor in order to produce ENTYCE® at commercial scale. "***The CVM has requested additional information regarding the proposed transfer in order to complete the supplemental application***."

12.     On this news, Aratana's securities price fell $1.44, or 17.93%, to close at $6.59 on February 6, 2017.

13.     Defendants intentionally concealed the truth – that Aratana was unprepared for prime time and lacked the means and capability to sell ENTYCE on a commercial scale -- in order to sell off large blocks of their personal holdings of Aratana stock during the Class Period. Indeed, Defendants collectively sold 264,676 shares of Aratana stock for proceeds of $2.5 million during the Class Period.  In the two years prior to the Class Period, defendant Tooman sold no shares and defendant St. Pierre only sold 150,000 shares as compared to 300,000 during the Class Period, all at suspicious times.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     **JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to §§10(b), 14(e) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(e) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because certain of the acts alleged herein, including the preparation and dissemination of the material false and/or misleading information, occurred in this District.  Aratana maintains its east coast base of operations in this District, located at 117 E 55th Str. New York, NY 10022. Aratana also transacts in this District, and the Company's securities trade on the NASDAQ, located within this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

III.     **PARTIES**

   A.     **Lead Plaintiffs**

   19.     Lead Plaintiff Joseph Bessent, as previously set forth in his certification supporting his motion for appointment as Lead Plaintiff, incorporated by reference herein, acquired Aratana securities at artificially inflated prices during the Class Period and was damaged thereby.

   20.     Lead Plaintiff John Corbitt as previously set forth in his certification supporting his motion for appointment as Lead Plaintiff, incorporated by reference herein, acquired Aratana securities at artificially inflated prices during the Class Period and was damaged thereby.

   21.     Lead Plaintiff Eric Pearson as previously set forth in his certification supporting his motion for appointment as Lead Plaintiff, incorporated by reference herein, acquired Aratana securities at artificially inflated prices during the Class Period and was damaged thereby.

   B.     **Defendants**

   22.     Defendant Aratana is incorporated in Delaware with its principal executive offices located at 11400 Tomahawk Creek Parkway, Suite 340, Leawood, Kansas 66211.  Aratana's securities trade on the NASDAQ under the ticker symbol "PETX."

   23.     Defendant Steven St. Peter ("St. Peter") founded Aratana in 2010 and has served as the Company's Chief Executive Officer ("CEO") and President since September 2012. St. Peter has been a Director of the Company since December 2010 and served as Chairman of the Board of Directors from December 2010 to September 2012.  Prior to receiving his Medical Degree, St. Peter was an investment banker at Merrill Lynch and holds an MBA from Wharton School of Business at the University of Pennsylvania. Defendant St. Peter participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Aratana and its business, operations, growth, financial statements and

financial condition.  Because of his position of control and authority, his ability to exercise power and influence with respect to Aratana's course of conduct, and his access to material inside information about Aratana during the Class Period, at all material times, Defendant St. Peter was a controlling person of Aratana within the meaning of § 20(a) of the Exchange Act.  As alleged herein, during the Class Period, St. Peter made materially false and misleading statements concerning Aratana and the commercialization of ENTYCE.

24.     Defendant Craig A. Tooman ("Tooman") has served as the Company's Chief Financial Officer ("CFO") since November 2013 and Treasurer since January 2014. Defendant Tooman directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning Aratana and its business, operations, growth, financial statements, and financial condition.  Moreover, because of his position of control and authority, his ability to exercise power and influence with respect to Aratana's course of conduct, and his access to material inside information about Aratana during the Class Period, at all material times, Defendant Tooman was a controlling person of Aratana within the meaning of § 20(a) of the Exchange Act. As alleged herein, during the Class Period, Tooman made materially false and misleading statements concerning Aratana and the commercialization of ENTYCE.

25.     St. Peter and Tooman are collectively referred to herein as the "Individual Defendants."

- 7 -

IV.     **BACKGROUND**

A.      **Aratana's Business**

1.   **Aratana Targets Novel Therapies to Treat Serious Medical Conditions in Pets**

26.     Aratana, a Delaware Company, maintains its corporate headquarters in Leawood, Kansas and trades on the NASDAQ under the symbol "PETX." Aratana's stated "goal" is to become "a leading provider of therapeutics developed and approved specifically the treatment of unmet medical needs in pets," namely, cats and dogs.

27.     The Company's pharmaceutical drug development program focuses on finding novel drug compounds that the Company believes have the potential to be large opportunities in serious medical conditions in pets.  In identifying potential pet therapeutics for development, Aratana targets human therapeutics that have demonstrated safety and effectiveness in at least two species that are in, or have completed, Phase I or Phase II clinical trials in humans.

28.     In October 2013, the Company acquired Vet Therapeutics, Inc. ("Vet Therapeutics") and in January 2014, the Company acquired Okapi Sciences NV ("Okapi Sciences," which was renamed Aratana Therapeutics NV and is referred to as "Aratana NV" for all post-acquisition references). Vet Therapeutics develops antibody-based biologics for humans, which is directed towards the development of pet-specific biologics to treat pet cancer and chronic conditions. Aratana NV is a biopharmaceutical company that focuses on licensing, development and commercialization of prescription medicines for animals.

29.     Aratana's drug portfolio includes therapeutic candidates consisting of small molecule pharmaceuticals and large molecule biologics.  Currently, the Company has three United States Food and Drug Administration ("FDA") approved therapeutics: GALLIPRANT® (grapiprant tablets) for the control of pain and inflammation associated with osteoarthritis in dogs,

- 8 -

which is commercially available; ENTYCE® (capromorelin oral solution) for appetite stimulation in dogs, which is now anticipated to be commercially available by late-2017; and NOCITA® (bupivacaine liposome injectable suspension) a local post-operative analgesia for cranial cruciate ligament surgery in dogs, which is commercially available. The Company also has two canine-specific monoclonal antibody (MAb) therapies, BLONTRESS® and TACTRESS®, which are fully licensed by the United States Department of Agriculture ("USDA") to aid in the treatment of dogs with B-cell and T-cell lymphoma, respectively.  With the exception of BLONTRESS, all of the Company's products above were FDA- or USDA-approved in 2016

30.     Aratana operates two development sites where new product candidates are identified: one in San Diego, California and one in Leuven, Belgium.  The San Diego location develops patent protected, species-specific, monoclonal antibodies against biological targets of known activity. The Company's Belgium location, which was acquired with the acquisition of Aratana NV, engages in pre-clinical discovery efforts and certain production animal research and development.

31.     In 2015, however, the Company decided to "wind down" the Belgium facility's pre-clinical discovery efforts and instead focus on clinical assets, development of core legacy programs (including certain drug candidates for EU approval), business development and monetization of production animal assets know-how obtained in the acquisition of Aratana NV. The Company currently employs approximately 50 employees.

### 2.     Pet Therapeutics is a $20 Billion Untapped Market

32.     Cats and dogs are the most popular pets in the United States, with approximately 86 million cats and 78 million dogs as household pets.  An estimated 68% of households have at least one pet, with many pet owners viewing their pets as important members of their families.

Over the last two decades, the role of pets in families has increased, with pet owners spending increasing amounts of money to maintain the health of their pets.  Consequently, pets are living longer and exhibiting many of the same signs and symptoms of aging and disease as humans. Thus, there is a significant untapped market for pet therapeutics, with the United States representing one-third of the global animal health market.

33.     As of March 2015, the U.S. animal health market was worth over $20 billion, with a high projected growth rate.  In 2016, it was valued at $24 billion with an expected continual growth rate of 3% to 2020.  In 2016 alone, $66.75 billion was spent on pets in the U.S., with $14.71 billion going towards supplies/over-the-counter medicine and $15.95 billion being spent on veterinary care.[1]  Because the pet medication market is vastly unaddressed in some areas, the drugs Aratana develops are often one of the only, or the only, treatment for certain diseases.  With respect to ENTYCE, analysts projected that it would generate $36.9 million in revenue in 2017 if commercialized in 2016. The Company itself stated it believes ENTYCE has the potential to be a "blockbuster" drug that generates $50 million to $100 million in revenue.

### 3.     Aratana Has No Manufacturing Facilities of Its Own and Heavily Relies on Third Parties to Commercialize its Pet Drug Products

34.     Aratana focuses primarily on research and development ("R&D") and has only recently began to consider commercialization efforts. As a result, Aratana has no internal manufacturing capabilities for active pharmaceutical ingredients API or drug products regulated by the Center for Veterinary Medicine ("CVM").  Indeed, Aratana states that it does not want to "devote capital and manpower toward developing or acquiring internal manufacturing facilities."

35.     The Company also states it does not have, nor does it plan acquire, the internal infrastructure or capability to manufacture formulated drugs for use in its targeted animal studies.

---

[1] http://www.americanpetproducts.org/press_industrytrends.asp

As the Company admits, it simply "***lack[s] the resources and capability to manufacture any of our therapeutic candidates on a scale necessary for commercialization***." (Emphasis added).

36.     Accordingly, Aratana utilizes third-party suppliers and manufacturers who supply API, drug product and packaged product for the development and commercialization of the Company's small molecule product candidates. Purportedly in hopes of ensuring dependable and high quality results, the Company relies on Current Good Manufacturing Practices ("cGMP") compliant contract manufacturer organizations ("CMO") when selecting manufacturers. Working with a CMO, however, is a risk.  Although Aratana "manages" the CMOs, the Company has no control over them and is entirely dependent on the CMO to ensure compliance with proper protocol.  Not only is Aratana completely dependent on the CMOs to comply with cGMP, but it also has no control over the CMO's ability to maintain adequate quality control and quality assurance practices.  This leaves Aratana at the mercy of others.

37.     For example, if the CVM does not approve the contracting manufacturer's facilities, then Aratana cannot proceed with production or commercialization of its product.  If the CMO does not have sufficient resources to devote to the manufacturing of Aratana's products, then Aratana's product will not get produced.

38.     Once the Company's products move from development-stage to commercial-stage, Aratana works with the relevant CMO to make changes in the manufacturing process as required to complete process validation, scale-up capacity and to implement process improvements.  When changes are made at this stage, depending on the nature of the changes, the Company may be required to make supplemental manufacturing filings with the FDA to obtain the required approval to manufacture and sell its products. For instance, if a CMO cannot produce the product in the

quantities needed, Aratana may need to seek additional regulatory approval from the FDA which, in turn, delays the production process.

39.     Aratana is further dependent on the CMO for obtaining the materials for manufacturing its products.  Thus, if the CMO is unable to obtain the necessary materials, the entire project could be delayed and/or cancelled.  Each change submitted for supplemental approval can cause delays in making the first commercial sale following the initial approval.

**B.     FDA Regulations Regarding Pet Drugs Manufacturing Requirements**

40.     Animal health products in the United States are regulated by three agencies: the FDA, the USDA, and the Environmental Protection Agency ("EPA").  The CVM at the FDA regulates animal pharmaceuticals under the Food, Drug and Cosmetics Act, while the Center for Veterinary Biologics ("CVB") at the USDA regulates veterinary vaccines and some biologics. The EPA regulates veterinary pesticides.  Aratana's product candidates are animal pharmaceuticals regulated by the CVM and animal biologics regulated by the USDA.

41.     As a condition to regulatory approval for the sale of animal products, the FDA requires a company, such as Aratana, to demonstrate that the product it is manufacturing is safe and effective for its intended use and in the intended species, ***and has a defined manufacturing process that ensures the product can be made with high quality consistency***. Aratana is subject to the CVM's regulatory requirements to receive approval to market and distribute its products, including ENTYCE.

42.     To begin the development process for product candidates in the United States, a company such as Aratana must first establish an Investigational New Animal Drug ("INAD") file with the CVM.  This file contains correspondence and submissions that identify the new drug under development.  The company then holds a pre-development meeting with the CVM to reach

a general agreement on the plans for providing data necessary to fulfill the requirements for a New Animal Drug Application ("NADA"). An NADA is required in order to obtain approval to sell the new animal drug in interstate commerce.

43.    The NADA consists of three technical sections, each of which must be satisfied to receive approval.   These sections include: (1) safety; (2) effectiveness and chemistry; and (3) manufacturing and controls ("CMC").   As part of the CMC technical section, a company must set forth its plan for commercializing the drug, including: (i) the ingredients used to make the drug; (ii) where the ingredients will come from; (iii) where the drug will be made; (iv) how the drug will be made; (v) how the drug will be packaged; and (vi) how long the drug can be stored for and the conditions it can be stored under.   An "important part" of this process from the FDA's perspective is "deciding when the FDA's investigators should inspect the manufacturing facilities where the drug is made."   When an inspection is needed, "FDA's investigators work with scientists at CVM to make sure the manufacturing facilities are using the correct equipment and methods to consistently produce a high-quality and safe drug."[2]   Approval will not be granted unless the product has a "defined manufacturing process that ensures that the product can be made with high quality consistency."

44.    During the development of a new product, a company must submit pivotal protocols to the CVM for review and concurrence prior to conducting the required studies. The company then gathers and submits data on all three of the technical sections, which is then reviewed according to timelines specified in the Animal Drug User Fee Act ("ADUFA"). Once all data has been submitted and reviewed, the CVM issues the company a separate technical section complete letter for each section.

---

[2]https://www.fda.gov/AnimalVeterinary/ResourcesforYou/AnimalHealthLiteracy/ucm219207.htm#Human_Food_Safety

45.     Once all three letters have been issued, the company then submits an administrative NADA for the CMV to review.  An administrative NADA is an original or supplemental NADA submitted after all technical sections have been reviewed by the CVM and the CVM has issued a technical section complete letter for each section.  The administrative NADA is the culmination of the completion of the phased review process work. The administrative NADA submission compiles a draft of the Freedom of Information Summary, the proposed labeling, and all other relevant information.  Generally, if there are no deficiencies in the submission, the NADA is issued within 60 days after submission of the administrative NADA, which was the case with all three of the Company's therapeutics that received FDA approval in 2016.

46.     Once the drug is approved, any post-approval changes to the product or manufacturing process need to be filed and approved by the FDA. Changes that may adversely affect the identity, strength, quality, purity, or potency of a drug, related to its safety or effectiveness, are considered "major changes" and specifically require the submission of a Prior Approval Supplement ("PAS").  A PAS has a 120-day review period and must be approved prior to distribution of the drug with that change. The FDA considers a ***major change*** to include the ***change of manufacturing sites*** if, for example, the site has never been inspected by FDA for the type of operation that is being moved, or the new site does not have a satisfactory CGMP inspection for the type of operation being moved.

47.     As discussed below, given Aratana's admitted dependence on third parties to manufacture the Company's drug products, and lack of internal manufacturing capabilities, Defendants knew that Aratana did not have the manufacturing capacity in place for a successful commercial launch of ENTYCE.  Thus, Aratana was not in compliance with FDA regulations and would inevitably have to seek subsequent FDA approval for a "major change" to the Company's

manufacturing site.  Yet, Defendants represented to the investing public that Aratana was in full compliance with FDA regulations and would be able to commercially launch ENTYCE by "mid-2016."

### C.     ENTYCE

48.     One of the Company's main products is ENTYCE, also known as AT-002 (capromorelin oral solution), which was in-licensed from RaQualia Pharma Inc. ("RaQualia") on December 27, 2010. The Company describes ENTYCE® (capromorelin oral solution) as a ghrelin receptor agonist and a new chemical entity to treat inappetence in dogs. Inappetence is a common problem in many acute and chronic diseases. Fear, pain, stress, trauma, aging, chronic renal failure and cancer are all possible causes of inappetence in pets. According to Aratana's market research, 9.8 million dogs in the United States are inappetent each year, 4.1 million of which are treated for the condition with highly palatable diets, fluids and electrolytes, feeding tubes or human drugs. Surveys conducted by Aratana also show that 81% of vets feel there is a need for a specific treatment for inappetence.  ENTYCE is a flavored, oral liquid prescription product that works by mimicking ghrelin, the hunger hormone, to stimulate appetite.

49.     Aratana received a technical section complete letter for ENTYCE with respect to safety and CMC in March 2015 and September 2015, respectively. The third and final technical section complete letter (for effectiveness) was received on February 23, 2016.  Having received all three technical section complete letters, the Company filed an administrative NADA with the CVM on March 22, 2016, seeking FDA approval of ENTYCE for appetite stimulation in dogs and received NADA approval on May 16, 2016.  The FDA's approval was huge for Aratana, representing the first regulatory approval, either veterinary or human, of a drug with this mechanism of action (i.e. a ghrelin receptor agonist).

50.     Aratana plans to sell ENTYCE directly to veterinarians and estimates a market of approximately 25,000 to 30,000 veterinary clinics in the United States. The Company intends to reach these customers by leveraging a combination of direct sales, contracts with large and small distributors, co-promotion agreements, contract selling agreements, and sales to corporate customers, including approximately 1,500 locations of the two largest veterinarian corporate hospitals in the USA.  Given that 2017 alone was projected to generate $36.9 million in revenue for ENTYCE, and the Company believes it has potential to be a "blockbuster" generating over $50 million to $100 million in revenue, the commercialization is a large scale operation.

51.     While Aratana hired a small contract manufacturer to develop ENTYCE's API for commercialization,[3] it submitted a PAS with the FDA requesting to transfer the manufacturing of ENTYCE to a new vendor shortly after its approval.  The PAS is currently pending and has resulted in a substantial delay in the commercialization of ENTYCE because Defendants failed to ensure that Aratana had the appropriate, larger scale manufacturing facility in place before submitting the NADA to the FDA in March 2015.  Approximately six months later, however, the Company needed cash to fund their commercialization efforts and entered in into a $40 million loan agreement. As explained below, this loan further hindered the Company's ability to commercialize ENTYCE.

**D.      In Order to Obtain Desperately Needed Liquidity to Fund New Drug Development, Aratana Enters into A Loan Agreement That Requires the Company to Quintuple the Number of FDA-Approved Products Within a Year**

52.     On October 16, 2015, Aratana and its wholly owned subsidiary, Vet Therapeutics Inc. (the "Borrowers"), entered into a Loan and Security Agreement (the "Loan Agreement") with

---

[3] The name and date that the contract manufacturer was hired are not disclosed. However, the Company ambiguously disclosed in its March 15, 2016 Form 10-K that one was hired.

Pacific Western Bank and Oxford Finance LLC ("the "Lenders"). The Loan Agreement provides the Borrowers with term loans in an aggregate principal amount equal to $35.0 million and a revolving credit facility in an aggregate principal amount of up to $5.0 million.  The Company used $15 million of the $40 million in proceeds under the Loan Agreement to repay all of the amounts owed under an existing credit facility with Pacific Western Bank, with the additional $25 million to be used in support of the Company's growth.

53.    The Loan Agreement contains certain terms and conditions that Aratana must comply with to avoid default. In the event of a default, the Borrowers indebtedness becomes immediately due and payable.

54.    First, the Loan Agreement requires that the Company maintain certain minimum liquidity (approximately $20 million as of the date the agreement was entered into) at all times. Second, the Loan Agreement "requires that the Borrowers have *at least four products fully USDA- or FDA-approved for commercialization by December 31, 2016*." (Emphasis added).

55.    At the time Aratana entered into the Loan Agreement in October 2015, the Company had only two products that were conditionally USDA- or FDA-approved -- BLONTRESS and TACTRESS.  Accordingly, the Company had only one year to achieve full approval for these two drugs and one additional drug to avoid default.

56.    Third, the Borrowers are also required to make interest-only payments on the Term Loan for 18 months and beginning on May 1, 2017, are required to make payments of principal and accrued interest on the Term Loan in equal monthly installments over a term of 30 months. *The interest-only period can be extended by one year to May 1, 2018 if the Borrowers have at least four products fully USDA or FDA- approved for commercialization by December 31, 2016, plus another product conditionally or fully-approved*. As noted above, at the time of the Loan

Agreement, Aratana only had two products that were conditionally USDA or FDA-approved. Thus, in order to delay payment on the principal amount of the loan, the Company needed *at least four* products to be fully approved in the next year. Delaying principal payments was significant, as the Company's payments would increase over $739,000 per month if Aratana had to make principal payments, from approximately $201,542 to $940,548. Significantly, this amounts to approximately $8.87 million more in payments due for that one year.

57.     Finally, the Loan Agreement requires that the Company receive unrestricted net cash proceeds of at least $45,000 from partnering transactions and/or the issuance of equity securities from October 16, 2015 to October 16, 2016. The Loan Agreement requires that the Company maintain certain minimum liquidity (approximately $20 million as of the date the Loan Agreement was entered into) at all times.

58.     Thus, not coincidentally, the same day the Loan Agreement was entered into, the Company also entered into a sales agreement (the "Sales Agreement") with Barclays Capital, Inc. ("Barclays"). Pursuant to the Sales Agreement, the Company may sell up to an aggregate of 52 million shares of its common stock through Barclays at any given time. Thereafter, from time to time, the Company sold shares pursuant to the Offering and was motivated to inflate, and keep inflated, its share price throughout the Class Period, so as to obtain the greatest amount of capital and remain in compliance with the terms of the Loan Agreement.

**E.      Aratana Rushes the Approval of ENTYCE in Order to Comply with the Loan Agreement and Extend Interest-Only Payments**

59.     In order to avoid default and delay principal payments for another year, Aratana set out to commercialize an unheard of number of products, *six*, in 2016 in hopes that something would stick. This was unprecedented because in the five years preceding 2016, there had only

been *four* major pet medication products approved *in the entire industry*. Therefore, approving six products would be unprecedented for the entire industry, let alone one company.

60.     Regardless, Aratana began to rush FDA approval of a myriad of new drugs, including ENTYCE, all the while knowing that the Company lacked manufacturing capabilities to support commercialization.  Defendants knew from the outset that most, if not all, of the drugs they submitted for approval would be approved because, according to Defendant St. Peter, Defendants were confident that they would be "six in six in terms of getting [their] initial portfolio of products approved" and he was "not aware of any product that's been submitted and then not approved under the administrative NDA process."

61.     The Company first obtained full approval for BLONTRESS in 2015.  Shortly thereafter, TACTRESS was fully approved by the CVB in January 2016.  That same month, on January 25, 2016, Aratana submitted a new drug application for GALLIPRANT, which was approved on March 21, 2016.  Fortunately for Aratana, the Company was able to quickly enter into an agreement with Elanco Animal Health ("Elanco"), a division of Eli Lilly and Company, granting Elanco exclusive rights to develop, manufacture, market, and commercialize GALLIPRANT. In other words, GALLIPRANT obtained approval but the Company did not need to worry about commercializing it since a large well-established manufacturer was in charge.  With the approval of GALLIPRANT, Aratana needed only one more drug to be fully approved and one to be conditionally approved by December of 2016 in order to comply with the terms of the Loan Agreement.

62.     Thus, one day after receiving FDA drug approval for GALLIPRANT, Aratana quickly submitted an NADA for ENTYCE.  The FDA granted approval of ENTCYE two months later on May 16, 2016.  Unlike with GALLIPRANT, Aratana did not have a large company ready,

willing and able to take over the manufacturing.  Due to Aratana's lack of internal manufacturing capabilities, the Company was not ready for prime time to manufacture ENTYCE on a commercial basis and certainly, not by "mid-2016" as previously represented.

63.    Only one month later, on June 30, 2016, Aratana once again rushed to submit an NADA for NOCITA.  FDA approval for NOCITA was received on August 12, 2016 and, by October 5, 2016, NOCITA was commercially available to veterinarians in the United States. With the approval of NOCITA, the Company had five fully approved USDA- or FDA- approved products and, thus, was in compliance with the Loan Agreement.

**F.    Defendants Conceal from Investors that Aratana is Unable to Find a Manufacturer/Supplier in Time to Commercialize ENTYCE in 2016**

64.    Defendants knew that given the market size for ENTYCE, the commercialization of this product was going to be a massive undertaking that exceeded Aratana's current capabilities. According to Defendant St. Peter, "the manufacturing scale for FDA approval is significant, [but] the scale that is required to support what we believe to be very two large commercial products [GALLIPRANT and ENTYCE] [i]s even larger." While Aratana was lucky that it found a large manufacturer to produce GALLIPRANT, it failed to find a large contractor capable of producing ENTYCE.

65.    Part of the Aratana's difficulty in finding a large contractor was because pet therapeutics is a new industry that companies were not familiar with.  The "entire animal health industry ha[d] only had four new chemical entities approved as pet therapeutics in the prior four years." Therefore, the companies Aratana needed to partner up with for a large commercialization were not familiar with the industry and hesitant to agree to such partnerships. Defendant St. Peter explained the problem as follows:

> [O]ne of the challenges is, there has really never been a pet biotech industry, so there really have not been a bunch of partnering deals between large companies and small companies. And I don't think that the large companies have ever seen a company step forward with a single NADA, with a new molecule for partnering and they've certainly not seen one step forward with three, with an entire series of addition ones in the background . . . . So it's going to be a very new idea for the large companies."

66.     On March 15, 2016, just one week before submitting its NADA for ENTYCE, the Company stated it was still "exploring" collaborations with companies that had established a commercial presence. At the time Aratana submitted its NADA, it was simultaneously attempting to "transfer[] the manufacturing technology process for . . . ENTYCE and scale-up required for commercialization." In other words, there was no manufacturer prepared to partner with Aratana to commercialize ENTYCE. Yet at this time, Aratana falsely told investors that ENTYCE would be commercially available by "late-2016."

67.     Without a large company to partner with, or manufacturing facilities of its own, Aratana knew it would be impossible to commercialize ENTYCE according to plan. As a last ditch effort, in July of 2016, Aratana hired Brent Standridge ("Stanbdridge") as the Company's new Chief Operating Officer, to help transition the Company from R&D to a commercial operation. While Standridge has experience with consulting and providing commercial and operations-related services to animal health companies, including Aratana, his introduction to the Company came too late. By July 2016, there was simply no way Standridge could miraculously turn an R&D company into a commercial company in less than six months.

68.     But Defendants knew this much long before Standridge came on board. Throughout the entirety of 2015 and 2016 the Company struggled with its transition from an R&D company to a commercial company. Defendants were experiencing such difficultly that during an August 7, 2015 investor call, Defendant Tooman revealed that "[*d]ue to manufacturing constraints*, we

expect limited commercialization through the T-CEP and B-CEP programs until late 2016 at which time a commercial launch as a lymphoma product is anticipated."

69.     Defendants attempted to skirt the issue by ambiguously telling investors that it was "working" on becoming a commercial company. For instance, in 2015, the Company said it was still working on "continu[ing] to plan for commercialization" of all six products. By August 2016, Defendants represented that: "Between now and our next financial results call in November, we believe that we will transition from the development company to a development in commercial company." The Company said it was "hiring additional experience commercial leaders" to assist with the process.  At this point, however, the Company was down to three months to transition into a manufacturing company to get ENTYCE on the market which was simply not feasible.

G.     **The FDA Informs Aratana its Manufacturing Facilities are Insufficient to Satisfy Regulations**

70.     On November 4, 2016, shortly after ENTYCE received CVM approval on May 16, 2016, Aratana disclosed that it filed a Prior Approval Supplement ("PAS") with the FDA requesting to transfer the manufacturing of ENTYCE to a new vendor in order to produce ENTYCE at commercial scale.  By the time November 2016 arrived, the Company had modified the anticipated commercialization date from prior announcements to the first quarter of 2017. Indeed, prior to November 2016, the Company had originally stated (as far back as August 2015), that it expected to commercially produce ENTYCE in mid-2016. Only one month later, on September 24, 2015, the Company issued a press release modifying its timeline for commercialization to mid-2016 "*or shortly thereafter.*  By March 15, 2016, Defendants pushed the launch date to "late-2016 or shortly thereafter."  Now, after receiving CVM approval, Aratana once again postponed the commercial launch date for ENTYCE.

71.     On February 2, 2017, the FDA responded to Aratana's PAS and, not surprisingly, requested additional information regarding the proposed transfer of the manufacturing of ENTYCE to a new vendor. As a result, commercialization was delayed until late 2017.  Unless and until the FDA has sufficient information that ENTYCE can be produced commercially, the commercialization of ENTYCE will continue to be pushed back.  To this day, Defendants have not come forward with information specifying how they intend to commercialize ENTYCE or who they intend to partner with in order to meet the large supply of this product.

72.     In the meantime, the delay in commercialization of ENTYCE will continue to result in inventory problems for Aratana.  To date, the Company has reported impairment charges of intangible assets and inventory adjustments totaling $15.1 million for full year 2016, and inventory valuation adjustment losses of $7.2 million for BLONTRESS®, TACTRESS®, ENTYCE and GALLIPRANT as a result of expired product. Specifically, these inventory adjustments included the process validation batches of ENTYCE which were approximately $2.6 million and a loss on a firm purchase commitment related to the manufacturing of ENTYCE inventories that were already in process of approximately $2 million.  Moreover, while ENTYCE was originally projected to generate $36.9 million in revenue in 2017, it is now estimated to generate only $27.7 million.

## V.     MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.     Materially False and Misleading Statements Regarding Aratana's Ability to Successfully Manufacture and Sell ENTYCE on a Commercial Scale

73.     The Class Period begins on March 16, 2015, when Aratana filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K"). Despite the fact Defendants

knew that Aratana did not have the internal capabilities to manufacture ENTYCE at a commercial scale, nor had the Company identified a collaborative partner to take on the manufacturing, Defendants, without any reasonable basis, assured investors that ENTYCE was set to be launch in 2016:

> *Development plan.* We plan to complete the pivotal field effectiveness study and we anticipate submission to the CVM in mid-year 2015 to complete the effectiveness technical section and we will respond to any questions related to our effectiveness and CMC technical section submissions. ***We plan to have all three major technical sections of the NADA completed in time to receive NADA approval in 2016.***

(Emphasis added).

74.     On May 8, 2015, Aratana filed its quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). In the Q1 2015 10-Q, the Company stated that it anticipated marketing approval of ENTYCE in 2016.

75.     Also on May 8, 2015, Defendants held a conference call with analysts.  During the Q1 2015 Earnings Conference Call, defendant St. Peter falsely assured investors that Aratana was on track to ensure the commercial launch of AT-002 by the time it was approved by the FDA:

> The company recently completed full enrollment in the pivotal field effectiveness study in client-owned dogs with AT-002, capromorelin, a ghrelin agonist, for appetite stimulation. Top line results are anticipated in late June 2015. Aratana previously submitted the CMC technical section to the CVM ***and Aratana is working to secure commercial supply.***

(Emphasis added).

76.     On August 6, 2015, Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC, announcing that the Company expected to commence commercialization of ENTYCE by mid-2016.

**Recent Development Highlights:**
- Positive results from the pivotal field study of AT-002 (capromorelin) in dogs with reduced appetite from a variety of causes. Clinical success rates were approximately 70% for the once-daily dose of AT-002 group vs. approximately 45% for the placebo group which represents a statistically significant difference (p<0.05), thereby achieving the study's primary endpoint as agreed under protocol concurrence with the FDA's Center for Veterinary Medicine ("CVM"). Secondary endpoints including an alternative owner appetite assessment questionnaire and body weight were also achieved. AT-002 appeared to be palatable and well accepted, and none of the serious adverse events were considered to be related to AT-002 treatment. ***Aratana anticipates submitting an administrative New Animal Drug Application ("NADA") for AT-002 in dogs in 2016, which if approved, would allow the Company to commence commercialization of the product in mid-2016.***

(Emphasis added)

77.    On August 7, 2015, Aratana filed the Company's quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q reaffirmed Aratana's capability to commercialize AT-002 immediately upon FDA approval, stating in relevant part:

We anticipate submitting the pivotal field effectiveness study results to the CVM as the final piece of the Effectiveness Technical Section. In March 2015, we received the target animal safety technical section complete letter for AT-002 in dogs from the CVM. We anticipate the CMC technical section complete letter for AT-002 by early 2016. ***We anticipate submitting an NADA for AT-002 in dogs in 2016, which if approved, would allow us to commence commercialization of the product in mid-2016.*** We are continuing our interactions with the European Medicines Agency and believe that our discussions and efforts will lead to the successful development of AT-002 outside the U.S.

(Emphasis added).

78.    Also, on August 7, 2015, Defendants held a conference call with analysts.  During the Q2 2015 Earnings Conference Call, defendant St. Peter overstated the Company's progress

towards commercialization and assured analysts that the Company would have six products on the market in 2016.

79.    In addition, in response to a question from one analyst about the manufacturing and supply capabilities for ENTYCE, defendant St. Peter assured investors that the Company was on and on track to complete a supply agreement with a contract manufacturer to support the launch of ENTYCE in 2016:

> **Steven St. Peter**…
> During this first half of 2015, and indeed since the first quarter call, ***Aratana has made remarkable progress towards our stated goal of advancing or expanding pipeline towards commercialization***.
> …
> Hence, in addition to the three FDA regulated therapeutics, we have three USDA regulated therapeutics rapidly moving forward.
> ***One implication of this substantial progress, Aratana believes that it will have six products on the market in 2016.*** And if we're successful, that will simply be unprecedented. Based on our research, the entire animal health industry has only had four new chemical entities approved as pet therapeutics in the prior four years. So this level of innovation is a paradigm shift, a shift that we believe will help drive the continued medicalization of the pet market and position Aratana as a companion animal veterinarian's critical partner.
> **…**
> I simply want to say that those of us at Aratana did not wake up yesterday and say, hey, we can have six products on the market in 2016, ***rather that has been the planning assumption for quite some time***. For those people that have visited us or seen us in action at the various trade shows since 2014 that is perhaps more obvious. As we concluded the close of the Q1 call, Aratana will be ready.
> …
> We do hope that these communications will help investors understand that Aratana is confident about and prepared for what lays ahead.
> …
> **Kevin Ellich**
> That's helpful. And then since you brought up supply and you have talked about manufacturing capacity for some of your lymphoma products, ***wondering if you could give us some more color on what you're doing to prepare for manufacturing and supply needs for AT-001, AT-002*** and AT-003 for next year?
>
> **Steven St. Peter**

Okay. With respect to AT-001, AT-002 and AT-003, those are all small molecules regulated by the FDA. So we're working with contract manufacturers on both these ATI as well as the product and commercial supply, and – I'll go in reverse order, with respect to AT-003, our supplier will be Pacira and it is that products, so we already have that supply agreement in place.

**With respect to AT-002, we are working to complete the commercial supply agreement on** that **one** and with respect to AT-001, also working to complete that agreement, **but those are things we have been working on and tracking to support the launch of the products in 2016.** But it will be contract manufacturing.

(Emphasis added).

80.     On September 24, 2015 Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC, announcing that the Company expected to commence commercialization of Entyce by mid-2016:

> AT-002 (capromorelin for inappetence in dogs)
> On August 26, 2015, the Company submitted the technical section for effectiveness, which included the results of the positive pivotal field effectiveness study conducted under protocol concurrence with the CVM.  The Company anticipates a response from the CVM by February 22, 2016.
>
> The Company anticipates receiving its technical section complete for CMC in late-2015 or shortly thereafter.  Accordingly, the Company anticipates submitting an NADA in early 2016, which if approved, **is expected to enable the Company to commence commercialization of the product in mid-2016 or shortly thereafter**.

(Emphasis added).

81.     On November 5, 2015 Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC, announcing that the Company expected to commence commercialization of ENTYCE "by mid-2016 or shortly thereafter." The Company also assured investors that Aratana would focus on and prioritizing commercial execution:

- 27 -

**Product Highlights**

...

- CMC technical section complete letter for AT-002 (capromorelin oral solution) in dogs with reduced appetite. On September 30, 2015, Aratana received the technical section complete letter for CMC, which in addition to the technical section complete letter for safety received in early 2015, constitutes the second major technical section complete letter. On August 26, 2015, Aratana submitted the technical section for effectiveness, which included results of the positive pivotal field effectiveness study conducted under protocol concurrence with the CVM. Aratana anticipates a response from the CVM by February 22, 2016. ***Aratana anticipates submitting a NADA in early 2016 and if approved, Aratana will work toward commercialization of the product in mid-2016 or shortly thereafter***. Aratana continues its interactions with European national agencies and believes that its efforts will lead to the successful development of AT-002 outside the U.S.

...

**Other Highlights**

...

"In recent months, clinical study results have illuminated where to focus - the approval and successful commercial launch of AT-001, AT-002 and AT-003. In parallel, we look to secure an outside-the-U.S. partnership and advance other therapeutics as appropriate," explained Dr. St. Peter. "***Clearly, in the near-term, the key priority is commercial execution.***"

(Emphasis added).

82.     On November 6, 2015, Aratana filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q confirmed that Aratana was on track to commercially launch Aratana in "mid-2016:"

On August 26, 2015, we submitted the technical section for effectiveness for AT- 002 (capromorelin, a ghrelin agonist), which included the results of the positive pivotal field effectiveness study conducted under protocol concurrence with the CVM. We anticipate a response from the CVM by February 22, 2016. On September 30, 2015, we received from the CVM the CMC technical section complete letter. We received the target animal safety technical

section complete letter in March 2015. Accordingly, ***we anticipate submitting an NADA in early 2016, which if approved, is expected to enable us to commence commercialization of the product in mid-2016 or shortly thereafter***. We are continuing our interactions with European national agencies, and believe that our discussions and efforts will lead to the successful development of AT-002 outside the U.S.

(Emphasis added).

83.    Also on November 6, 2015, Defendants held a conference call with analysts. During the Q3 2015 Earnings Conference Call, defendant St. Peter reassured investors that Aratana was "on track" for the commercial launch of ENTYCE in 2016:

> During 2015, we have made remarkable progress towards our stated goal of advancing multiple products through the various regulatory agencies. Indeed we anticipate having an unprecedented number of pet therapeutics approved by the FDA in 2016. And we believe that these exciting products are spot on with respect to addressing unmet and underserved medical needs in pets that exist in the market today. In developing these products we have completed safety studies, demonstrated GMP manufacturing, conducted pilot field studies and successfully completed the rigorous pivotal field effects on the studies. In fact, it was these first three products AT-001, AT-002 and AT-003 that we discussed at the time we went public in 2013.
>
> ***We're proud of the fact that 2.5 years later we believe that we're on track to have these products reach the market in 2016, with clinical results and market research that frankly exceeded our expectations. We very much look forward to launching these products next year.*** At next week's Investor Day, we will be providing more details on why we're confident in these products and our overall commercialization strategy.

(Emphasis added).

84.    On November 17, 2015 Aratana filed a Form 8-K with the SEC to update investors on business information in connection with an Investor Day held in New York City on November 12, 2015.  In the November 17 8-K, Defendants falsely claimed that Aratana was making progress towards the commercial launch of its products, including ENTYCE:

Commercial Strategy
Based on industry sources, we believe national veterinary distributors cover approximately 90% of the companion animal veterinary hospitals in the U.S. It is our understanding that each of their sales teams can range up to 300 field sales representatives who call on the various practices every two-to-three weeks. ***The Company plans to have discussions with the national veterinary distributors in the first and second quarters of 2016 to discuss potential distribution arrangements for our product candidates.***

(Emphasis added).

85.     On March 14, 2016, Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC, announcing that the Company expected to commence commercialization of ENTYCE by "late-2016" rather than "mid-2016", yet failed to disclose that the reason for the delay was because, contrary to Defendants' prior statements, Aratana did not have manufacturing capabilities in place for a successful launch of ENTCYE:

**Recent Highlights**
**…**
- Technical Section Complete Letter for Effectiveness from FDA for ENTYCE® (capromorelin oral solution). In February 2016, the Company announced receipt of the third major technical section complete letter (effectiveness) required to file an administrative NADA for CVM approval of ENTYCE for appetite stimulation for dogs with inappetence. Aratana is finalizing the product label, completing the other minor sections and expects to submit the administrative NADA by the end of March 2016. ***If approved by the CVM, Aratana anticipates commercial availability of ENTYCE in late-2016 or shortly thereafter.***

(Emphasis added).

86.     On March 15, 2016, Aratana filed its annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K") confirming that the Company expected to commence commercialization of ENTYCE in late 2016, but failing to disclose that Aratana would never be

able to successfully launch ENTYCE in 2016 because the Company lacked the commercial

capabilities to do so:

> ENTYCE
> During 2015, we received the target animal safety technical section complete letter and the CMC [Chemistry, Manufacturing and Controls] technical section complete letter, and on February 23, 2016, we announced the receipt of the technical section complete letter for effectiveness from the CVM for ENTYCE for appetite stimulation in dogs.
> …
> We anticipate submitting an administrative NADA [new animal drug application] by the end of March 2016, which if approved, is ***expected to enable us to commence commercialization of ENTYCE in the United States in late-2016*** or shortly thereafter. We are continuing our interactions with European national agencies, and believe that our discussions will lead to the successful development of capromorelin outside the U.S. We believe that the first claim in dogs for Europe will be either acute appetite stimulation or a chronic use weight gain claim. We also intend to pursue capromorelin for weight gain in dogs in the U.S. as a label extension after approval of the appetite stimulation claim.
> ...
> We expect to receive FDA approval for GALLIPRANT, ENTYCE and NOCITA in 2016, and begin commercializing product candidates GALLIPRANT in 2016 and ***ENTYCE in late-2016*** or shortly thereafter and NOCITA in 2016.

(Emphasis added).

87.    Despite this delay, Defendants falsely assured investors that Aratana had the

necessary facilities and resources in place in order to have "sufficient supply" to successfully

launch ENTYCE:

> We have identified contract manufacturers to provide commercial supplies of the APIs and formulated drugs for our lead pharmaceutical product candidates, other than NOCITA, for which we expect to obtain marketing approval. These contract manufacturers have established track records of quality product supply and significant experience with regulatory requirements of both CVM and EMA. ***We are currently transferring the manufacturing technology process for GALLIPRANT and ENTYCE and scale-up required for commercialization. We believe we have or will have sufficient supply of formulated drugs to meet our commercial forecast.***

- 31 -

(Emphasis added).

88.     Also, on March 15, 2016, Defendants held a conference call with analysts.  During the Q4 2015 Earnings Conference Call, in response to a question from one analyst about the reasons for the delayed launch of ENTYCE, defendant St. Peter downplayed the delay and claimed it was simply due to typical manufacturing things related to product labeling and SKUs.  St. Peter also assured investors that Aratana was on target to "scale-up" without issue:

> **John Kreger**
> Great. Thanks. And then, as you said, you should, with any luck, get your first approval next week. But I think you're not talking about an actual commercial launch until the fall. ***Can you talk about what are the other manufacturing-related items that need to happen that are driving the timing?***
>
> **Steven St. Peter**
> Yes. Thanks, John. So a number of things create that time between when you get the formal approval and when you actually launch the product. One of which is you actually have to really create the commercial supply with the product labeling and all of the different SKUs for the products, so that you can actually stock, if you're going to use distributors, you can stock the distributors and also make the product available.
>
> So one issue is just that ramping up the commercial supply and inventory to launch. One of the others is the conference sequence and really thinking about when you want to be launching. And obviously, between holidays is not ideal. There's certain big conferences you want to be ready for. And then the other is sequencing vis-a-vis the other product launches. Because it's obviously, you want good focus when you're launching, so you'd want to separate those out a little bit so that you and your distributors, if you have them, can really focus on the launch of that product. So we're in the process of sequencing all of those to really get to those launches and as we get the approvals, we will know where to go on that.
>
> And the other challenge that we have, obviously, is commercial scale up. You run the clinical trials with smaller batches of product. That's what the approval is based on. Then as you move to commercialization, you scale that up to support, really, a commercial product. ***And so we're doing that with respect to both***

*GALLIPRANT and ENTYCE*. With respect to NOCITA, fortunately we have a supply agreement with Pacira, who is supplying the product. *But with respect to GALLIPRANT and ENTYCE, we're seeking to enter those supply agreements to really support the overall commercial forecast*.

**Jon Block**
Great. Thanks. Good morning. Steven, you may have just touched on this in the answer to the last question from John*, but let me just ask one on ENTYCE and ENTYCE manufacturing*. So the NADA gets submitted by the end of March. Arguably, that starts a 60 day clock. So I think you referenced, hopefully, the end of May approval. *Why not commercial availability until year end or maybe even early 2017, I think you referenced in the press release?* Can you just talk about why maybe that 6 to 8 month delay between approval and commercialization specific to ENTYCE?

**Steven St. Peter**
Well, it's a similar timeline, actually, for GALLIPRANT, which we expect next week. And then we've said in the fall is when we'll be launching. *So that window, John, of several months, for all the reasons that I tried to explain previously, scaling up commercial supply sequencing the launches, thinking about when in the calendar you want to be launching. Those are the factors that really – and also getting the actual inventory made and shipped,* all the different SKUs – and those are that create that time lag.

(Emphases Added). Defendant St. Peter, however, failed to mention that the true reason for the delay was because Aratana lacked any capability to be able to launch ENTYCE on a commercial scale.

89.   On May 5, 2016 Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC, containing the same materially false and misleading statements as the March 15, 2016 Press Release regarding Aratana's timeline to launch ENTYCE:

Recent Highlights
…
Filed for FDA approval of ENTYCE® (capromorelin oral solution). The Company filed an administrative NADA for CVM approval of Entyce for appetite stimulation for dogs. The Animal Drug User Fee Act (ADUFA) date for approval is set for May 21,

> 2016. If approved by CVM, ***Aratana anticipates commercial availability of Entyce in late-2016*** or shortly thereafter.

(Emphasis added).

90.     On May 6, 2016 Aratana filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q contained the same materially false and misleading statements as the March 15, 2016 Press Release regarding Aratana's timeline to launch ENTYCE:

> ENTYCE
> On March 22, 2016, we announced we filed an administrative new animal drug application ("NADA") with the CVM for ENTYCE (capromorelin oral solution) for appetite stimulation for dogs. The Animal Drug User Fee Act ("ADUFA") date for approval has been set for May 21, 2016. If approved, ***we anticipate commercial availability of ENTYCE to veterinarians in late-2016*** or shortly thereafter.

(Emphasis added).

91.     With respect to Aratana's manufacturing capabilities, Defendants stated that Aratana purportedly had already identified, and had in place, commercial suppliers for ENTYCE:

> **Business Updates**
> During the three months ended March 31, 2016, we continued to make progress towards our objective of becoming a fully integrated and commercial-stage company in 2016. During the quarter we received our first FDA approval, submitted for our second FDA approval, and continued to progress on the manufacturing commercial supply for upcoming product launches and prepare ourselves to have a commercial presence in the pet therapeutic market.
> …
> **Manufacturing and Supply Chain**
> During the quarter we continued to transfer the manufacturing technology processes for GALLIPRANT and ENTYCE to our identified active pharmaceutical ingredient and formulated product contract manufacturers to provide commercial supplies.

92.     Also on May 6, 2016, Aratana held a conference call with analysts.  During the Q1 2016 Earnings Conference Call, defendant St. Peter confirmed that the Company's preparation for a successful commercial launch was well underway as Aratana was hiring sales people:

> First, we were pleased to receive our first FDA approval in March 2016, GALLIPRANT with control of pain and inflammation associated with osteoarthritis in dogs. Second, we continue to anticipate our second FDA approval later this month for ENTYCE for appetite stimulation for dogs, ***which should label a commercial launch in late 2016*** or shortly thereafter.
> …
> Furthermore, we have ***commenced the process of hiring the sales organization***, including our regional leadership team and/or approximately two dozen territory specialists or sales reps to support not only Aratana's co-promote arrangement with Elanco on GALLIPRANT, ***but also Aratana's anticipated launches in ENTYCE*** and NOCITA.

(Emphasis added).

93.     On August 4, 2016 Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC. The press release disclosed that Aratana was, again, delaying the commercial launch of ENTYCE, yet failed to disclose that the reason for the delay was because, contrary to Defendants' prior statements, Aratana did not have manufacturing capabilities in place for a successful launch of ENTCYE:

> Recent Highlights
> Granted FDA approval of ENTYCE® (capromorelin oral solution). The U.S. Food and Drug Administration's Center for Veterinary Medicine (CVM) approved Entyce for appetite stimulation in dogs in May 2016. ***Aratana intends to commercially launch Entyce in the United States in the first quarter of 2017 in conjunction with the North American Veterinary Conference and other major veterinary conferences***.

(Emphasis added).

94.     On August 5, 2016, Aratana filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the

"Q2 2016 10-Q"). The Q2 2016 10-Q repeated the same false and misleading statements concerning the commercial launch of ENTYCE as the August 4 Press Release:

> ENTYCE
> On May 16, 2016, the FDA's CVM approved ENTYCE (capromorelin oral solution) for appetite stimulation in dogs. ***We intend to commercially launch ENTYCE in the United States in the first quarter of 2017*** in conjunction with the North American Veterinary Conference and other major veterinary conferences.

(Emphasis added).

95.     With respect to Aratana's manufacturing capabilities, Defendants repeated the same materially false and misleading statements as the May 6, 2016 Q1 2016 10-Q regarding purportedly identified commercial suppliers for ENTYCE:

> **Manufacturing and Supply Chain**
> During the second quarter of 2016, we continued to transfer the manufacturing technology processes for GALLIPRANT and ENTYCE to our identified active pharmaceutical ingredient ("API") and formulated product contract manufacturers to provide commercial supplies.

96.     Also on August 5, 2016, Defendants held a conference call with analysts.  During the Q2 2016 Earnings Conference Call, defendant St. Peter repeated the same false and misleading statements concerning the commercial launch of ENTYCE as the August 4 Press Release:

> I'll begin today's call by highlighting the progress that Aratana continues to make with respect to the clinical and regulatory milestones for our late-stage therapeutics.
> First, we were pleased to receive our second FDA approval in May 2016, ENTYCE for appetite stimulation for dogs. ***We continue to anticipate the commercial launch in the first quarter of 2017,*** in conjunction with the North American Veterinary Conference and other conferences.

(Emphasis added).

97.     On November 3, 2016, Aratana issued a press release, also attached as exhibit 99.1 to Form 8-K filed with the SEC, which repeated the same prior false statements concerning the commercial launch of ENTYCE:

> **Recent Highlights**
> The Company continues to anticipate commercial launch of ENTYCE® (capromorelin oral solution) in the first quarter of 2017, assuming Aratana's supply of Entyce is approved and released.

98.     On November 4, 2016, Aratana filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  In the Q3 2016 10-Q Aratana falsely claimed that the Company had the necessary capabilities for commercial launch and was continuing to make progress:

> GALLIPRANT and ENTYCE
> During the third quarter of 2016, we continued to transfer the manufacturing technology processes for GALLIPRANT and ENTYCE to our identified active pharmaceutical ingredient ("API") and formulated product contract manufacturers to provide commercial supplies. We have completed the required manufacturing validation work in regards to API for both GALLIPRANT and ENTYCE. We made additional manufacturing filings with the FDA to obtain approvals that are required for commercial launch. Further, *we continue to complete the required manufacturing validation work of formulated product and packaging to produce inventory for commercial availability*.

(Emphasis added).  Unbeknownst to investors, however, Aratana did not have the necessary manufacturing capabilities to successfully launch ENTYCE and, thus, had to go back to the FDA for approval of a new proposed vendor.

99.     In the Q3 2016 10-Q, Defendants also claimed that the Company had the manufacturing capabilities in place for a successful launch of ENTYCE:

> **Manufacturing and Supply Chain**
> GALLIPRANT and ENTYCE

During the third quarter of 2016, we continued to transfer the manufacturing technology processes for GALLIPRANT and ENTYCE to our identified active pharmaceutical ingredient ("API") and formulated product contract manufacturers to provide commercial supplies. ***We have completed the required manufacturing validation work in regards to API for both GALLIPRANT and ENTYCE.*** We made additional manufacturing filings with the FDA to obtain approvals that are required for commercial launch. Further, we continue to complete the required manufacturing validation work of formulated product and packaging to produce inventory for commercial availability.

(Emphasis added).

100.    Also on November 04, 2016, Defendants held a conference call with analysts

During the Q3 2016 Earnings Conference Call, defendant St. Peter had the following exchange

with an analyst:

**Ethan Roth:**
Great. now it's very helpful. And last question here, just on the supply for GALLIPRANT and ENTYCE, what are the steps that you need to take from here to ensure that supplies ready for early 2017 and the event that it's not approved in release and this something that could delay the launch and by a few weeks, months, quarters, any thought on the actual launch data in relation to the supply? Thank you.

**Steven St. Peter:**
So we're not changing the timing of what we expect, I think based on any of that. I think as we've discussed several times in the past few years, there is a lag between the approval and the product launch for these two products because there are new chemical entities and that takes several months. And so maybe to give you some insight as to what's happening there, so while the manufacturing scale for FDA approval is significant, the scale that is required to support what we believe to be very two large commercial products was even larger. And our approach has not been the scale off all the way to that commercial scale at risk. And so what that means is significant post approval work, and that includes in some cases transferring the API or active pharmaceutical ingredient manufacturing, in other cases moving the formulation of the drug product or packaging and really process improvements.

And so when you make those sorts of changes and moves, those things that required various filings with the FDA to make sure that they understand everything that you're doing. I mean we need to let those play out before we can actually ship products to customers and then of course I think *some good news is at this point, we believe that we've basically made all the necessary filing. This is a matter of playing those out.*

And then beyond the regulatory requirements, both Aratana and our collaborators have certain quality standards and procedures that they have to be set aside before a product is released to market and I think that's true for basically all pharmaceuticals. And so that's all what's happening over the next weeks to months, to support the timelines that we've articulated and I apologize if that was a lot of kind of how the sausage is made, but there is a pioneer in the industry, especially the public company we really tried to over communicate on that. So hope that was helpful.

101.    The above statements were materially false and misleading when made because: (1) Aratana did not have the internal capability to successfully launch ENTYCE on a commercial scale; (2) the Company's existing vendors were ill-equipped to manufacture ENTYCE on a commercial scale; (3) Aratana did not have manufacturing contracts in place sufficient to support manufacturing of ENTYCE at a commercial scale; (4) the above lack of manufacturing capabilities resulted in significant delays in the launch of ENTYCE; (5) as a result of the above, Aratana had to go back to the FDA to obtain approval of a new vendor to manufacture ENTYCE; and, thus, (6) it was more than a matter of "playing those out"; (7) consequently, ENTYCE was not likely to be commercially available until late 2017.

**B.      Defendants' Materially False and Misleading Statements Regarding Compliance with FDA Regulations**

102.    On March 16, 2015, Aratana filed the 2014 10-K. In the 2014 10-K, Aratana claimed to have complied with regulatory requirements regarding the "development and launch" of the Company's drug product candidates:

**Regulatory**

- 39 -

The development, approval and sale of animal health products are governed by the laws and regulations of each country in which we intend to sell our products. ***To comply with these regulatory requirements, we have established processes and resources to provide oversight of the development and launch of our products*** and their maintenance in the market.

*United States*

Three federal regulatory agencies regulate the health aspects of animal health products in the United States: the FDA; the USDA; and the Environmental Protection Agency ("EPA").

The CVM at the FDA regulates animal pharmaceuticals under the Food, Drug and Cosmetics Act. The CVB at the USDA regulates veterinary vaccines and some biologics pursuant to the Virus, Serum, Toxin Act. The EPA regulates veterinary pesticides under the Federal Insecticide, Fungicide and Rodenticide Act. Many topical products used for treatment of flea and tick infestations are regulated by the EPA.

Our current product candidates are animal pharmaceuticals regulated by the CVM and monoclonal antibodies regulated by the USDA. Manufacturers of animal health pharmaceuticals, including us, must show their products to be safe, effective ***and produced by a consistent method of manufacture***.

(Emphasis added).

103.    On November 6, 2015, Defendants held a conference call with analysts. During the

Q3 2015 Earnings Conference Call, defendant St. Peter reassured analysts that in developing its

products, Aratana had demonstrated GMP manufacturing:

During 2015, we have made remarkable progress towards our stated goal of advancing multiple products through the various regulatory agencies. Indeed we anticipate having an unprecedented number of pet therapeutics approved by the FDA in 2016. And we believe that these exciting products are spot on with respect to addressing unmet and underserved medical needs in pets that exist in the market today**. *In developing these products we have completed safety studies, demonstrated GMP manufacturing***, conducted pilot field studies and successfully completed the rigorous pivotal field effects on the studies. In fact, it was these first three products AT-001, AT-002 and AT-003 that we discussed at the time we went public in 2013.

(Emphasis added).

104.    The above statements were materially false and misleading when made because: (1) Aratana had insufficient resources in place to ensure the Company had adequate manufacturing capabilities for the commercial launch of ENTYCE; (2) Aratana was unable to show the Company's products could be produced by a "consistent method of manufacture"; and, thus, (3) the Company was not in compliance with appropriate regulatory requirements.

**C.    Risk Disclosures Inadequate Because Risk Materialized or Insufficiently Specific**

105.    In the 2014 10-K, Defendants purported to warn investors that if the regulatory bodies do not approve the Company's contracted manufacturers, Aratana would need to find an alternative manufacturing facility, which could adversely impact or delay approval:

> If our contract manufacturers cannot successfully manufacture material that conforms to our specifications and complies with regulatory requirements, they will not be able to secure and/or maintain regulatory approval for their manufacturing facilities. ***If the CVM, the USDA or the EMA does not approve our contract manufacturers' facilities used for the manufacture of our product candidates, or if any such agency withdraws any such approval in the future, we may need to find alternative manufacturing facilities, which would adversely impact our ability to develop and obtain regulatory approval for or market our product candidates, if approved.***
>
> We and our third-party contractors are continuing to refine and improve the manufacturing process for our product candidates, certain aspects of which are complex and unique. We may encounter difficulties with new or existing manufacturing processes. In addition, to manufacture our product candidates in the quantities that we believe would be required to meet anticipated market demand, ***our third-party manufacturers may need to increase manufacturing capacity, which could involve significant challenges and may require additional regulatory approvals***. Neither we nor our third-party manufacturers may successfully complete any manufacturing scale-up activities required to increase existing manufacturing capabilities in a timely manner, or at all.

(Emphasis added).

- 41 -

106.     On May 8, 2015, Aratana filed the Q1 2015 10-Q. In the Q1 2015 10-Q Aratana purported to warn investors about general risks related to approval from regulatory bodies and success of product commercialization:

> [D]evelopment of our biologic product candidates is dependent upon relatively novel technologies and uncertain regulatory pathways, and biologics may not be commercially viable; denial or delay of regulatory approval for our existing or future product candidates; failure of our product candidates that receive regulatory approval to obtain market approval or achieve commercial success; […] our reliance on third-party manufacturers, suppliers and collaborators; regulatory restrictions on the marketing of our product candidates; […] the uncertainty of the regulatory approval process and the costs associated with government regulation of our product candidates; failure to obtain regulatory approvals in foreign jurisdictions [...]

107.     On August 07, 2015, Aratana filed the Q2 2015 10-Q. In the Q2 2015 10-Q Aratana repeated the same general warnings about risks related to approval from regulatory bodies and success of product commercialization:

> [D]evelopment of our biologic product candidates is dependent upon relatively novel technologies and uncertain regulatory pathways, and biologics may not be commercially viable; denial or delay of regulatory approval for our existing or future product candidates; failure of our product candidates that receive regulatory approval to obtain market approval or achieve commercial success; […] our reliance on third-party manufacturers, suppliers and collaborators; regulatory restrictions on the marketing of our product candidates; […] the uncertainty of the regulatory approval process and the costs associated with government regulation of our product candidates; failure to obtain regulatory approvals in foreign jurisdictions [...]

108.     On November 06, 2015, Aratana filed the Q3 2015 10-Q. In the Q3 2015 10-Q Aratana also repeated the general warnings about operational risks related to approval from regulatory bodies and success of product commercialization:

> [D]evelopment of our biologic product candidates is dependent upon relatively novel technologies and uncertain regulatory pathways, and biologics may not be commercially viable; denial or delay of regulatory approval for our existing or future product candidates; failure of our product candidates that receive regulatory approval to obtain market approval or achieve commercial success; […] our reliance on third-party manufacturers, suppliers and collaborators; regulatory restrictions on the marketing of our product candidates; […] the uncertainty of the regulatory approval process and the costs associated with government regulation of our product candidates; failure to obtain regulatory approvals in foreign jurisdictions [...]

109. On March 15, 2016, Aratana filed the 2015 10-K, which purported to warn investors that if the regulatory bodies do not approve the Company's contracted manufacturers, Aratana would need to find an alternative manufacturing facility, which could adversely impact or delay approval:

> If our contract manufacturers cannot successfully manufacture material that conforms to our specifications and complies with regulatory requirements, they will not be able to secure and/or maintain regulatory approval for their manufacturing facilities. *If the CVM, the USDA or the EMA does not approve our contract manufacturers' facilities used for the manufacture of our product candidates, or if any such agency withdraws any such approval in the future, we may need to find alternative manufacturing facilities, which would adversely impact our ability to develop and obtain regulatory approval for or market our product candidates, if approved.*

> We and our third-party contractors are continuing to refine and improve the manufacturing process for our product candidates, certain aspects of which are complex and unique. We may encounter difficulties with new or existing manufacturing processes. In addition, to manufacture our product candidates in the quantities that we believe would be required to meet anticipated market demand, *our third-party manufacturers may need to increase manufacturing capacity, which could involve significant challenges and may require additional regulatory approvals*. Neither we nor our third-party manufacturers may successfully complete any manufacturing scale-up activities required to increase existing manufacturing capabilities in a timely manner, or at all.

- 43 -

(Emphases added).

110.    The 2015 10-K also purported to warn investors of the risk that the Company's

manufacturers may be unable to comply with applicable regulatory requirements, when in fact

these risks had already materialized:

> The development and commercial success of our current product
> candidates will depend on a number of factors, including . . . the
> **ability of us or our third-party manufacturers to manufacture
> supplies of any of our current or future product candidates and to
> develop, validate and maintain commercially viable
> manufacturing processes that are compliant with cGMP**;
>
> *                *                *
>
> We do not control the manufacturing processes used by, and we are
> completely dependent on, our contract manufacturers to comply
> with cGMP for the manufacture of both active pharmaceutical
> ingredients and finished drug products. In addition, we have no
> control over the ability of our contract manufacturers to maintain
> adequate quality control and quality assurance practices and to
> engage qualified personnel. If our contract manufacturers cannot
> successfully manufacture material that conforms to our
> specifications and complies with regulatory requirements, they will
> not be able to secure and/or maintain regulatory approval for their
> manufacturing facilities. **If the CVM, the USDA or the EMA does
> not approve our contract manufacturers' facilities used for the
> manufacture of our product candidates**, or if any such agency
> withdraws any such approval in the future, **we may need to find
> alternative manufacturing facilities, which would adversely
> impact our ability to develop and obtain regulatory approval for or
> market our product candidates, if approved**.

(Emphasis added).

111.    The 2015 10-K further purported to warn that the Company's third-party

manufacturers may be unable to meet anticipated market demand, requiring manufacturing

changes that may not meet regulatory approval:

> We and our third-party contractors are continuing to refine and
> improve the manufacturing process for our product candidates,
> certain aspects of which are complex and unique. We may encounter
> difficulties with new or existing manufacturing processes. In
> addition, **to manufacture our product candidates in the quantities
> that we believe would be required to meet anticipated market**

> *demand, our third-party manufacturers may need to increase*
> *manufacturing capacity, which could involve significant*
> *challenges and may require additional regulatory approvals*.
> Neither we nor our third-party manufacturers may successfully
> complete any manufacturing scale-up activities required to increase
> existing manufacturing capabilities in a timely manner, or at all.

(Emphasis added).

112.    On August 5, 2016, Aratana filed the Q2 2016 10-Q, which repeated general

warnings about operational risks related to approval from regulatory bodies and success of product

commercialization:

> [D]evelopment of our biologic product candidates is dependent
> upon relatively novel technologies and uncertain regulatory
> pathways, and biologics may not be commercially viable; denial or
> delay of regulatory approval for our existing or future product
> candidates; failure of our product candidates that receive regulatory
> approval to obtain market approval or achieve commercial success;
> […]   our   reliance   on   third-party   manufacturers,   suppliers
> and collaborators; regulatory restrictions on the marketing of our
> product candidates; […] the uncertainty of the regulatory approval
> process and the costs associated with government regulation of our
> product candidates; failure to obtain regulatory approvals in foreign
> jurisdictions [...]
>
> Arrangements with collaborators or others may require us to
> relinquish rights to certain of our technologies or product
> candidates. *In addition, there is a risk that we may never*
> *successfully* complete development of our product candidates,
> obtain adequate patent protection for our technology*, obtain*
> *necessary regulatory approval for our product candidates or*
> *achieve commercial viability for any approved product candidates.*

(Emphasis added).

113.    On November 4, 2016, Aratana filed the Q3 2016 10-Q, repeating the same false

and misleading statements regarding the Company's risks as contained in the Q2 2016 10-Q:

> [D]evelopment of our biologic product candidates is dependent
> upon relatively novel technologies and uncertain regulatory
> pathways, and biologics may not be commercially viable; denial or
> delay of regulatory approval for our existing or future product

candidates; failure of our product candidates that receive regulatory
approval to obtain market approval or achieve commercial success;
[…] our reliance on third-party manufacturers, suppliers
and collaborators; regulatory restrictions on the marketing of our
product candidates; […] the uncertainty of the regulatory approval
process and the costs associated with government regulation of our
product candidates; failure to obtain regulatory approvals in foreign
jurisdictions [...]

114.    The above statements were materially false and misleading when made because

Defendants failed to disclose that: (i) the transfer of the manufacturing technology process for

ENTYCE consisted of a material change that would impact the business; (ii) that the Company

manufacturing "business risks" had materialized because the Company could not find a CGMP

compliant contract manufacturer organization ("CMO") in time to commercialize ENTYCE in

2016 and, thus, (iii) the purported risks had already materialized.

## VI.    **THE TRUTH IS REVEALED**

### A.    **Defendants Announce Commercialization of ENTYCE is Delayed for Over One Year**

115.    On February 6, 2017, prior to the market opening, Aratana filed a report on Form

8-K with the SEC providing certain business updates and announcing that the commercial

availability of ENTYCE would be pushed back until *late 2017*.  The report stated, in relevant part:

In connection with the 2017 North American Veterinary Conference
in Orlando, Florida, on February 6, 2017, Aratana Therapeutics, Inc.
(the "Company") provided certain business updates.

***The Company now anticipates that ENTYCE® (capromorelin oral
solution) will be commercially available by late-2017.*** On February
2, 2017, the Company received a response from the U.S. Food and
Drug Administration's Center for Veterinary Medicine ("CVM") in
connection with the Company's post-approval supplement request
to transfer the manufacturing of ENTYCE® to a new vendor in
order to produce ENTYCE® at commercial scale. ***The CVM has
requested additional information regarding the proposed transfer
in order to complete the supplemental application,*** and the
Company intends to work with the CVM to address its request.

- 46 -

(Emphasis added.)

116.    On this news, Aratana's securities fell $1.44, or 17.93%, to close at $6.59 on February 6, 2017.

117.    Upon this news, one analyst commented that this announcement meant "it will take the company *more than a year* to bring this drug to market. That's never a good sign for any biotech company, let alone one that is still losing money each quarter." Brian Feroldi, *Why Aratana Therapeutics Inc. is Tumbling Today,* The Motley Fool (Feb. 6, 2017).

**B.    Aratana is Forced to Write-Off ENTYCE Inventory Due to Manufacturing Delays**

118.    On March 13, 2017, after the close of market, Aratana filed a report on Form 8-K with the SEC providing further business updates and revealing inventory adjustment losses as a result of ENTYCE.  The Form 8-K stated, in relevant part:

> *Aratana Therapeutics Reports Fourth Quarter and Full Year 2016 Financial Results*
>
> LEAWOOD, Kan., March 13, 2017- Aratana Therapeutics, Inc. (NASDAQ: PETX), a pet therapeutics company focused on the licensing, development and commercialization of innovative therapeutics for dogs and cats, announced its fourth quarter and full year 2016 financial results. For the quarter ended December 31, 2016, Aratana reported a net loss of $23.3 million or $0.64 diluted loss per share, which includes $10.7 million in inventory adjustments and impairment of an intangible asse**t. *For the full year of 2016, Aratana reported a net loss of $33.6 million or $0.95 diluted loss per share, including impairment charges of intangible assets and inventory adjustments totaling $15.1 million.***
> …
> Financial Results
> The fourth quarter net loss was $23.3 million or $0.64 diluted loss per share, compared to a net loss of $12.9 million or $0.37 diluted loss per share for the corresponding quarter ended December 31, 2015. For the year ended December 31, 2016, Aratana reported a net loss of $33.6 million or $0.95 diluted loss per share compared to a net loss of $84.1 million or $2.45 diluted loss per share in 2015**. *In 2016, results included inventory valuation adjustment losses of***

- 47 -

> **$7.2 million for BLONTRESS®, TACTRESS®, Entyce and Galliprant.** Full year 2016 results included non-cash intangible asset impairment charges of $7.9 million related to Blontress, Tactress and AT-007. In 2015, Aratana financial results included non-cash intangible asset impairment charges of $43.4 million.

(Emphases added.)

119.    On March 14, 2017, Aratana filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K confirmed the inventory write-off for ENTYCE product that had expired as a result of the numerous commercialization delays:

> 5. Inventories
>
> During the fourth quarter of 2016, the Company expensed $2,639 of previously capitalized process validation batches of ENTYCE as research and development expenses **due to the Company concluding that the future commercial use and future economic benefit can no longer be reasonably determined for process validation batches that were intended to be used as commercial launch inventories**. In addition, the Company expensed $1,983 of costs incurred related to manufacturing of ENTYCE under a firm purchase commitment as research and development expenses due to the Company concluding **that the future commercial use and future economic benefit can no longer be reasonably determined**. At December 31, 2016, $1,983 was accrued as a loss on a firm purchase commitment in the consolidated balance sheets.

(Emphasis added).

120.    Also on March 14, 2017 Defendants held the Q4 2016 Earnings Conference Call with analysts. During the Q4 2016 Earnings Conference Call, defendant Tooman explained:

> [T]hese inventory adjustments included the process validation batches of ENTYCE which were approximately $2.6 million and a loss on a firm purchase commitment related to manufacturing of ENTYCE inventories that were already in process of approximately $2 million. **This inventory was originally intended to be used as commercial launch inventories**.

(Emphasis added).

121.   On this news, Aratana's stock dropped $1.63, or nearly 24%, from a closing price of $6.95 on March 13, 2017 to $5.32 on March 14, 2017.

## VII.   POST-CLASS PERIOD EVENTS

122.   On April 25, 2017, Aratana issued a press release announcing that it had reached an agreement with the FDA and believed it would be able to commercialize ENTYCE by the Fall of 2017, if it received FDA approval:

> Aratana believes that it is in agreement with CVM on how to proceed. Aratana intends to resubmit the required prior approval submission in the coming weeks. If the submission is approved, Aratana believes it would be able to make ENTYCE commercially available by the fall of 2017.

123.   On this news, the Company's stock price increased from a closing price of $6.04 on April 25, 2017 to $6.40 on April 26, 2017.

124.   On May 4, 2017, Aratana filed a report on Form 8-K with the SEC providing certain business updates.  The report stated, in relevant part:

> Placement Agency Agreement and Securities Purchase Agreement
>
> On May 3, 2017, the Company entered into a Securities Purchase Agreement (the "Securities Purchase Agreement") with certain investors for the sale by the Company of 5,000,000 shares of the Company's common stock, par value $0.001 per share (the "Shares"), at a purchase price of $5.25 per share (the "Offering"). The Shares are being offered and sold pursuant to an effective registration statement on Form S-3 (File No. 333-197414) and a related prospectus supplement. Subject to certain closing conditions, the Offering is expected to close on or around May 9, 2017.
>
> The Company expects to receive net proceeds from the Offering of approximately $24.4 million, after deducting placement agent fees and estimated offering expenses. ***The Company intends to use the net proceeds of the offering for general corporate purposes, including commercialization activities relating to ENTYCE and inventory related to GALLIPRANT***.

(Emphasis added).

- 49 -

125.    On May 8, 2017 Aratana filed a report on Form 8-K with the SEC providing certain

business updates.  The report stated, in relevant part:

> Recent Updates
> …
> The Company met with FDA in April 2017, and *Aratana believes it*
> *is in agreement on how to proceed regarding the proposed transfer*
> *and scale-up of the manufacturing of ENTYCE® (capromorelin oral*
> *solution) for appetite stimulation in dogs. Aratana intends to re-*
> *submit the prior approval submission in the coming weeks. If the*
> *submission is approved, Aratana believes it would be able to make*
> *ENTYCE commercially available by the fall of 2017.* Additionally,
> the Company initiated a pivotal target animal safety study
> evaluating capromorelin for weight management in cats with
> chronic kidney disease under an FDA-concurred protocol in the first
> quarter of 2017 and continues an ongoing FDA-concurred pivotal
> efficacy study in cats.
> (Emphases added).

126.    On May 9, 2017 Aratana filed a quarterly report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended March 31, 2017

(the "Q1 2017 10-Q").  The Q1 2017 10-Q, Aratana stated in relevant part:

> Business Updates
> During the three months ended March 31, 2017, we continued to
> introduce our pet therapeutics to veterinarians. Alongside our
> collaborator, Eli Lilly and Company, acting on behalf of its
> Elanco Animal Health Division ("Elanco"), we introduced our
> therapeutic GALLIPRANT for the control of pain and inflammation
> associated with osteoarthritis in dogs in late January 2017.
> Furthermore, during the first quarter of 2017, we continued to call
> on accounts to drive new orders and re-orders of NOCITA for local
> post-operative analgesia for cranial cruciate ligament surgery in
> dogs. In the same period, we also initiated two pivotal field studies,
> raised capital and continued to make progress on securing the
> regulatory approvals required to launch ENTYCE for appetite
> stimulation in dogs.
> …
>
> Research and Development
> …
> ENTYCE (capromorelin oral solution) for dogs

ENTYCE was approved by the FDA for appetite stimulation in dogs in 2016. We anticipate that ENTYCE will be commercially available by the fall of 2017.

…

Manufacturing and Supply Chain

….

ENTYCE

As we announced in February 2017, for ENTYCE, we continue to interact with the FDA on our filing in support of the transfer and scale-up of the manufacturing of API and formulated product with our CMO. As part of these regulatory interactions for ENTYCE, we met with the FDA in April 2017 in connection with our prior-approval supplement ("PAS") to transfer the manufacturing of the API of ENTYCE to a new vendor in order to produce ENTYCE at commercial scale. We believe that we have an agreement with the FDA on how to proceed. We intend to re-submit the PAS in the coming weeks. If the PAS is approved, we believe we would be able to make ENTYCE commercially available by the fall of 2017.

(Emphasis added).

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

127.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

128.    The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein.  Each was a senior executive officer and/or director of Aratana and thus controlled the information disseminated to the investing public in the Company's press releases and SEC filings.  As a result, each could falsify the information that reached the public about the Company's business and performance.

129.     Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes herein to inflate the Company's stock price and profit from insider sales of large blocks of their personal holdings of Aratana securities.   The Individual Defendants' scienter may be imputed to Aratana as the Individual Defendants were among the Company's most senior management and were acting within the scope of their employment.

### A.     The Individual Defendants Knowingly and Recklessly Misrepresented the Company's Ability to Commercially Launch ENTYCE and Time to Market

130.     The Individual Defendants knew Aratana did not have the facilities capable of commercially producing ENTYCE, nor had they secured a vendor that could handle the large scale manufacturing required for ENTCYE in order produce ENTYCE on a commercial scale and, thus, Defendants would never meet their reported time to market of "mid-2016" because: (1) Defendants strategically delayed the expected commercial launch of ENTYCE by one quarter at a time, thereby disguising the fact there was no adequate facility to launch ENTYCE without alerting investors to the fact; (2) ENTYCE was material to Aratana's business, projected to account for approximately 56.5%-72% of its revenue; and (3) Aratana was well aware that any changes to its commercial manufacturing vendor would result in the FDA requesting additional time and information to approval the change.

#### 1.     Inconspicuously Changed Timeline for ENTYCE Commercialization

131.     Aratana rushed approval of ENTYCE to market in order to satisfy the conditions of the Loan Agreement before the Company had secured the necessary facilities either internally or through a collaboration with a third party to enable Aratana to successfully produce ENTCYE on a commercial scale.  Without FDA approval of the manufacturing for ENTYCE, Aratana lacked any certainty that the drug would be approved for commercial sale.

132.     Rather than tell investors the truth, Defendants gave false dates as to when the drug would be commercially available.  Once the represented date arrived, Defendants were then forced to acknowledge the fact that commercialization had not commenced. At this point, Defendants strategically bumped the anticipated launch date back one quarter, so that the delay appeared minor and did not raise any concern among investors or lenders. At the same time they delayed commercialization, Defendants blamed it on minor, administrative reasons such as finalizing the product label, completing the "other minor sections" of the NADA, labeling the SKUs for the products, and timing the launch according the best time in the calendar year, such as "in conjunction with the North American Veterinary Conference and other major veterinary conferences."

133.     Eventually, however, the FDA called Aratana's bluff, demanding more information on the alleged commercial facilities, and thereby alerting investors the truth, *i.e.*, Aratana did not have the capabilities to commercially produced ENTYCE.  As of the filing of this complaint, the FDA still has not approved the PAS submitted in late 2016.

134.     On August 7, 2015, Aratana first informed investors of ENTYCE's expected commercialization in its Q2 2015 10-Q, which stated that as long as the NADA for ENTYCE was approved (which it was), commercialization would commence in mid-2016.

135.     Only one month later, on September 24, 2015, the Company issued a press release inconspicuously modifying its timeline for commercialization to mid-2016 "*or shortly thereafter*." (Emphasis added.).  The addition of "shortly thereafter" was such a slight variation from the original representation that it likely went unnoticed by investors.

136.     Once mid-2016 arrived, however, the Company had still not identified a capable vendor to commercially manufacture ENTYCE and, thus, had no choice but to further delay its

launch.  Of course, the FDA had not approved the manufacture of ENTCYE as of yet and, thus, there was no guarantee the drug would ever be sold in the market.

137.    On March 15, 2016, Defendants announced that ENTYCE would not commercially launch now, until "late-2016 or shortly thereafter."  By delaying the launch from "mid" to "late" 2016, the delay (again) appeared minor and not significant enough to warrant alarm among investors.

138.    Once late-2016 arrived, however, ENTYCE had once again not launched, forcing Aratana to announce another delay for the launch date.  Accordingly, on August 4, 2016, Aratana announced ENTYCE would be commercially launched in "the first quarter of 2017."  Again, the shift from "late 2016" to "first quarter 2017" was not a significant delay of time to warrant concern.  Indeed, the Company disguised this set back as being strategic, stating it would be launched "in conjunction with the North American Veterinary Conference and other major veterinary conferences."  Defendant St. Peter further reassured investors in November 2016 that Aratana was a "pioneer in the industry" and that "some good news is at this point, we believe that we've basically made all the necessary filings."

139.    Finally, on February 6, 2017, the Company was forced to inform investors that the CVM had requested additional information for approval and ENTYCE would not be commercially available until "late-2017."  At this point, it became apparent that the delay was not insignificant or the result of a strategic decision. Rather, it was a result of the fact Aratana was not capable of commercializing ENTYCE at that time.

140.    In essence, Defendants modified the launch date ever so slightly so as to go unnoticed.  When viewed holistically, ***the delay amounts to one year and a half***.  Indeed, Defendants' representations began with a launch date of "mid-2016" and ended with a launch date

- 54 -

of "late-2017," *still* conditioned on the CVM's approval.

### 2.     ENTYCE Comprises Over Half of Aratana's Future Revenues

141.    As alleged herein, the pet therapeutics market is a largely untapped market worth over $24 billion in 2016 alone.  ENTYCE is the first drug to receive regulatory approval, either veterinary or human, to stimulate appetite in dogs, which affects approximately 10 million dogs in the U.S. per year.  Given the large market size for inappetence drugs, ENTYCE was expected to be a "blockbuster" drug capable of generating $50 million to $100 million in revenue per year. The projected revenue for ENTYCE was extremely significant, as it represented more revenue than any single year of revenue generated by the Company to date.  For example, in the year ended December 31, 2016, the Company reported total revenues of $38.551 million.

142.    If ENTYCE generates $50-$100 million, as projected, that is approximately **56.5%-72%** of the Company's overall revenue.  This percent is even more substantial when looking at the revenue reported for year ended December 31, 2015, which was $678,000, or 150 times less than the projected revenue for ENTYCE.

143.    Given that ENTYCE was projected to single handedly generate more revenue alone than the Company has generated in any one year, the financial viability of the Company depended on the success of ENTYCE and constituted a material aspect of Aratana's business.

144.    Accordingly, the Individual Defendants are rightly presumed to have knowledge as a matter of law.

### 3.     Defendants Were Not in Compliance with FDA Regulations

145.    The CMC section of the FDA application requires Aratana to have "a defined manufacturing process that ensures the product can be made with high quality consistency." Aratana must also disclose other information regarding its plan for commercialization, including

where the drug will be made, how it will be made, and how it will be packed. Once FDA approval has been obtained, any subsequent changes to the commercialization specifications set forth in the CMC that qualify as "major changes" must be resubmitted to the FDA for approval.

146.    The FDA considers a major change to include the ***change of manufacturing sites*** if, for example, the site has never been inspected by FDA for the type of operation that is being moved, or the new site does not have a satisfactory CGMP inspection for the type of operation being moved.  These changes are submitted to the FDA in a PAS.

147.    Here, Defendants did not follow the commercialization plan set forth in the CMC. Defendants would have understood that substituting a new vendor for commercialization after FDA approval would qualify as a "major change," which requires a PAS submission and a 120-day review period. Accordingly, Defendants were aware that their change in the commercial plans for ENTYCE would not have satisfied FDA regulations and require another FDA review of the proposed manufacturing process and facilities prior to the commercial launch of ENTYCE.

148.    As Defendant St. Peter explained, "transferring the API or active pharmaceutical ingredient manufacturing, [or] in other cases moving the formulation of the drug product or packaging and really process improvements," those changes "require[] various filings with the FDA to make sure that they understand everything you're doing."

149.    Indeed, Defendant was also well aware of this since, throughout the FDA approval process, Aratana was in constant communications with the FDA regarding the approval of ENTYCE. For instance, the Company had to have all three technical complete sections approved followed by the NADA.  While the first technical section complete letter was received in March 2015, the NADA was approved approximately one year later.  Throughout that time span, the Company had to convey to the FDA its commercialization efforts and adjust its application based

on feedback received from the FDA.

150.   Accordingly, by virtue of Defendants' extensive knowledge regarding the FDA approval process and the consequences of filing "major changes" to an application after approval, as well as its communications with the FDA throughout the approval process, Defendants were aware that their manufacturing process for ENTYCE was not in compliance with FDA regulations and, thus, ENTYCE could not be commercialized on the timeline represented, if ever.

**B.      The Individual Defendants Had Motive to Commit the Alleged Fraud and Conceal the Company's Inability to Commercially Launch ENTYCE from Investors**

151.   Defendants were motivated to rush ENTYCE to market even though Aratana lacked the ability to commercialize the drug and conceal the truth and/or omit material factors in order to: (1) sell off large blocks of Aratana stock for financial gain; (2) avoid principal payments under the Loan Agreement; and (3) inflate the price of Aratana securities to ensure the success of its public offering and provide the funds necessary to meeting the conditions set forth in the Loan Agreement.

**1.      The Individual Defendants Had Motive to Commit the Alleged Fraud to Sell Off Large Blocks of Their Personal Holdings of Aratana Securities**

152.   The Individual Defendants were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Aratana's securities price and maximize their individual profits through insider trading.

153.   The Individual Defendants collectively sold 264,676 shares of Aratana common stock over the Class Period for collective proceeds of $2,473,581.33.

**a.      Defendant Tooman's Insider Class Period Sales**

154.   As demonstrated in the chart below, Defendant Tooman's sales during the Class

Period are suspicious in both timing and amounts:

| Date | Shares | Price | Proceeds | Plan |
|---|---|---|---|---|
| 9/9/16 | 30,000 | $9.2533 | $277,599.00 | 10b5 Trading Plan, adopted on 8/9/16 |
| 2/1/16 | 2,806 | $3.328 | $9,338.368 | 10b5 Trading Plan, adopted 8/25/15 |
| 11/9/15 | 3,620 | $7.5243 | $27,237.966 | 10b5 Trading Plan, adopted 8/25/15 |
| 10/2/15 | 3,250 | $8.058 | $26,188.5 | 10b5 Trading Plan, adopted 8/25/15 |
| **Total:** | **39,676** | | **$314,175.33** | |

155.    First, defendant Tooman had **_no sales_** prior to the start of the Class Period and has not had a single sale since the Class Period ended, on February 3, 2017.  Indeed, it was not until October 2, 2015 that Tooman started selling off his holdings. Suspiciously, this was only a few days after Aratana received the CMC technical complete letter from the CVM and approximately two weeks prior to the Company entering into the Loan Agreement.

156.    Defendant Tooman's most recent sale is suspicious as well.  On September 9, 2016, Tooman sold 30,000 shares at a price of $9.2533 for proceeds of $277,599.  Prior to this sale, the most stock Tooman ever sold at once was 3,620 shares, and $27,237 was the largest proceeds obtained for any one sale. Tooman's September 9th sale was clearly an attempt to get out of Aratana while he could. Indeed, the September 9th sale was made exactly two months before the Company announced that it "made additional manufacturing filings with the FDA to obtain approvals that are required for commercial launch."  With full knowledge of the implications of this statement, Tooman knew it was only a matter of time before the FDA discovered the Company did not have commercial manufacturing in place and investors would discover the truth.

**b.    Defendant St. Peter's Insider Class Period Sales**

157.    Defendant St. Peter's trading history also indicates his sales were made based on insider knowledge:

| Date | Shares | Price | Proceeds | Plan |
|---|---|---|---|---|
| 4/17/2017 | 50,000 | $5.54 | $277,150 | 10b5 Trading Plan, adopted 11/8/16 |
| 1/27/2017 | 50,000 | $7.72 | $385,875 | 10b5 Trading Plan |
| 12/15/2016 | 50,000 | $7.63 | $381,380 | 10b5 Trading Plan |
| 8/9/2016 | 50,000 | $9.25 | $462,500 | 10b5 Trading Plan, adopted 8/24/15 |
| 6/17/2016 | 25,000 | $6.32 | $158,020 | 10b5 Trading Plan |
| 6/16/2016 | 75,000 | $6.24 | $468,292.5 | 10b5 Trading Plan |
| **Total:** | **300,000** | | **$1,664,925** | |

158.    During the Class Period, St. Peter sold 300,000 shares for proceeds of over $1.66 million.

159.    Prior to the start of the Class Period, Defendant St. Peter sold no more than 25,000 shares at a single time.  Specifically, in 2014, St. Peter only sold 50,000 shares for proceeds of $628,667.50 in two separate transactions in which he sold 25,000 shares each.

160.    St. Peter's sales during the Class Period, however, significantly increased so that the smallest number of shares sold at any one time was 50,000.  Specifically, in 2015, he doubled the number of shares sold to $100,000 shares for proceeds of $1,442,408.

161.    In 2016, however, Defendant St. Peter made four separate sales of 75,000, 25,000, 50,000 and 50,000, two of which were back to back sales on June 16 and 17, 2016 for a total of 100,000 shares and proceeds of $1,470,193.

162.    Defendant St. Peter wasted no time selling off more stock in 2017 as evidenced by his January 27, 2017 sale of 50,000 shares, just days before the Company announced it would not

be able to commercially produce ENTYCE as promised.

163.    While the Individual Defendants' stock sales were made pursuant to 10b5-1 trading plans, the circumstances under which the plans were made belie any inference that they were established in good faith.  All of the plans in question were entered into during the Class Period, well after Defendants knew or should have known that they did not have the facilities to commercially produce ENTYCE.

164.    Moreover, the Individual Defendants' sales were irregular in terms of the number of shares sold and they occurred at irregular intervals. Sales pursuant to a trading plan should occur with a prescribed, regular pattern of stock sales, such as 500 shares a month on the 10th day of the month. This was not the case here. As reflected in the charts above, the Individual Defendants' trades were irregular and often correlated with market moving events or dates on which the Individual Defendants would likely be in possession of material non-public information, and therefore are inherently suspicious.

165.    Even if the Individual Defendants could demonstrate that their trading was not irregular (and they cannot), 10b5-1 plans have been heavily scrutinized by the SEC in light of an eye-opening *Wall Street Journal* investigation that found that insiders who were trading pursuant to such plans still were trading at opportune times and reaping better-than-expected results. According to the article, executives still can time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.[4]

166.    Similarly, according to a report issued by the law firm Wilson Sonsini Goodrich & Rosati in March 2013, "[t]he floodlights now aimed at such [trading] plans are the result of recent

---

[4] *See* Susan Pulliam & Rob Barry, *Executives' Good Luck in Trading Own Stock*, Wall St. J. (Nov. 27, 2012) at http://www.wsj.com/articles/SB10000872396390444100404577641463717344178.

Wall Street Journal articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits—or avoided significant losses—by trading company stock in the days just before their companies issued market-moving news." The report suggests that clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (e.g., 1,000 shares a month on the 15th day of the month)."[5]

> **2.     The Individual Defendants Had Motive to Commit the Alleged Fraud to Avoid Interest Payments Under the Credit Agreement/Loan Agreement**

167.     The Individual Defendants were also motivated to commit the alleged fraud in order to meet the requirements of the Loan Agreement and delay the Company's principal payments.

168.     As set forth in the Loan Agreement, unless three products were fully USDA- or FDA- approved by December 2016, the Company would be in breach of the agreement and Aratana's indebtedness would become immediately due and payable.  Not only would the Company be required to pay back the $40 million it had just financed, but it would lose any source of funding.  Without funding, the Company would have no financial means to research, develop or commercialize its products.  Moreover, once investors caught wind of the fact the Company defaulted, Aratana securities would likely crash.

169.     Defendants were also seeking to avoid having to pay back additional funds on the Loan Agreement as well. Pursuant to the terms of the Loan Agreement, Aratana was required to make interest-only payments on the Term Loan for the first 18 months.  Once May 1, 2017 came, however, the Defendants were required to make principal payments as well.  If, however, Aratana obtained USDA- or FDA-approval for *four* products, and conditional approval for one additional product, by December 31, 2016, Aratana's principal payments would be delayed until May 1,

---

[5]   Steve Bochner & Nicki Locker, *WSGR Insight & Analysis* (Mar. 2013) available at https://www.wsgr.com/PDFSearch/Rule-10b5-1-trading-plans.pdf.

2018.

170.    The additional year of foregoing principal payments is significant.  If Aratana was obligated to make principal payments, its monthly payments would increase by over $739,000, which amounts to approximately ***$8.87 million*** for the entire year.  For a Company that only generates revenue in the hundreds of thousands, with the exception of 2016, $8.87 million is not an amount of cash readily available

171.    Accordingly, in order to avoid default and principal payments, the Defendants rushed to get as many USDA- and FDA- approved products as possible and would worry about the repercussions later.

### 3.    The Individual Defendants Had Motive to Commit the Alleged Fraud to Ensure the Success of the Company's October 2015 Public Offering

172.     On October 16, 2015, the same date that the Company announced the Loan Agreement, it entered into the Sales Agreement with Barclays pursuant to which Aratana could sell up to an aggregate of $52.0 million of shares of its common stock through Barclays, as the Company's sales agent.

173.    Aratana's entry into the Sales Agreement was essential in order for the Company to raise capital and comply with the liquidity terms of the Loan Agreement.  As discussed *supra*, under the Loan Agreement, the Company is required to maintain certain liquidity at all times — the greater of: (i) cash equal to fifty percent of outstanding balance; or (ii) remaining months' liquidity, which is calculated on an average trailing three-month basis, equal to six months or greater. As of March 31, 2016, this equated to approximately $26.9 million. By September 2016, this increased to approximately $38.6 million, creating even more pressure for Aratana to raise capital.

174.    Thereafter, from time to time, the Company sold shares pursuant to the Offering in

order to meet the covenants of the Loan Agreement.  Defendants were motivated to inflate, and keep inflated, the Company's share price throughout the Class Period, so as to obtain the greatest amount of capital from the periodic offerings. Throughout the Class Period, Aratana sold approximately 1,629,408 shares for aggregate proceeds of $14.6 million.

175.    In order to keep its share price inflated, Defendants purposefully misrepresented the commercial availability of ENTYCE.

176.    Moreover, Defendants understood that if Aratana could not satisfy the requirements of the Loan Agreement, which was entirely dependent on the Company's ability to bring its products to market, that its share price would fall which, in turn, would frustrate the Company's ability to obtain the greatest possible amount of capital from further sales pursuant to the Offering.

177.    Therefore, Defendants had further motive and opportunity to misrepresent the commercial availability of Entyce.

## IX.    LOSS CAUSATION

178.    The market for Aratana securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Aratana securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Aratana securities relying upon the integrity of the market of Aratana and market information related to the Company, and have been damaged thereby.

179.    During the Class Period, Defendants named in this Action materially mislead the investing public, thereby inflating the price of Aratana stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their statements, as set forth herein, not false and/or misleading.  These material misstatements and

omissions created the false impression that Aratana had the capabilities to commercially produce ENTYCE when, in reality, Aratana did not have a manufacturer or supplier capable of commercially producing ENTYCE on a commercial scale.

180.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants named in this Action made or caused to be made a series of materially false and/or misleading statements about Aratana's ability to commercialize ENTYCE.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  The materially false and/or misleading statements made by Defendants named in this Action during the Class Period resulted in Plaintiffs and other members of the Class purchasing Aratana's securities at artificially inflated prices, thus causing damages complained of herein.  For example:

- In response to a May 8, 2015 earnings call announcing that Aratana was "working to secure commercial supply" for ENTYCE, the Company's stock price increased from $13.26 on May 7, 2015 to $13.49 on May 8, 2015.

- In response to the November 6, 2015 Form 10-Q announcing financial and operating results for the quarter of 2016 and stating that Aratana "anticipate[s] submitting an NADA in early 2016, which if approved, is expected to enable us to commence commercialization of the product in mid-2016 or shortly thereafter," the Company's stock price increased from $7.24 per share on November 5, 2015 to $7.59 per share on November 6, 2015.

- In response to a May 15, 2016 earnings call announcing that Aratana is "very much on track" to "launch the products right away," the Company's stock price increased from $5.66 per share on May 13, 2016 to $6.09 per share on May 16, 2016.

- In response to an August 4, 2016 press release announcing that "Aratana intends to commercially launch Entyce in the United States in the first quarter of 2017 in conjunction with the North American Veterinary Conference and other major veterinary conference", the Company's stock price increased from $7.97 on August 4, 2016 to $8.46 on August 5, 2016

181.   During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that caused the price of Aratana securities to be artificially inflated by failing to disclose and/or misrepresenting the adverse facts detailed herein. As the Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Aratana's securities was removed, and the price of Aratana's securities fell.  For example:

- In response to the February 6, 2017 announcement that "ENTYCE . . . will be commercially available by late-2017" and the "CVM has requested additional information regarding the proposed transfer in order to complete [Aratana's] supplemental application," the Company's stock fell 17.93% from a close of $8.03 per share on February 3, 2017 to $6.59 per share on February 6, 2017.

- In response to the March 13, 2017 Form 8-K filed with the SEC, announcing "impairment charges of intangible assets and inventory adjustments totaling $15.1 million" and "inventory valuation adjustment losses of $7.2 million for BLONTRESS®, TACTRESS®, Entyce and Galliprant" for full year 2016, the Company's stock fell nearly 24% from $6.95 per share on March 13, 2017 to $5.32 per share on March 14, 2017.

182.   As a result of their purchases of Aratana securities during the Class Period at artificially inflated prices, Plaintiffs and other Class members suffered economic loss, i.e., damages, under the federal securities laws.

183.   The timing and magnitude of the price decline in Aratana's stock negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to

Defendants' fraudulent conduct.

## X.     CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Aratana securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

185.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Aratana securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Aratana or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

187.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

188.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Aratana;

- whether the Individual Defendants caused Aratana to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Aratana securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, the proper measure of damages.

189.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    <u>NO STATUTORY SAFE HARBOR</u>

190.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Class Action Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false

may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward- looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Aratana who knew that the statement was false when made.

## XII.   APPLICABILITY OF FRAUD-ON-THE-MARKET

191.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Aratana securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Aratana securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

192.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

193.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

194.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

195.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against Defendants.

196.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly: (i) engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; (ii) made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances  under which they were made, not misleading; and (iii) employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the

market price of Aratana securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Aratana securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants each took the actions set forth herein.

197.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Aratana securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Aratana's finances and business prospects.

198.    By virtue of their positions at Aratana, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

199.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Aratana, the Individual Defendants had knowledge of the details of Aratana's internal affairs.

200.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Aratana. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Aratana's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Aratana securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Aratana's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Aratana securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

201.    During the Class Period, Aratana securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Aratana securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Aratana securities was substantially lower than the prices paid by Plaintiffs and

the other members of the Class. The market price of Aratana securities declined sharply upon public disclosure of the facts alleged herein causing to the injury of Plaintiffs and Class members.

202.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

203.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating false and misleading financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

204.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

205.    During the Class Period, the Individual Defendants participated in the operation and management of Aratana, and conducted and participated, directly and indirectly, in the conduct of Aratana's business affairs. Because of their senior positions, they knew the adverse non-public information about Aratana's misstatement of income and expenses and false financial statements.

206.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Aratana's financial condition and results of operations, and to correct promptly any public  statements issued by Aratana which had become materially false or misleading.

207.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Aratana disseminated in the marketplace during the Class Period concerning Aratana's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Aratana to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Aratana within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Aratana securities.

208.    Each of the Individual Defendants, therefore, acted as a controlling person of Aratana. By reason of their senior management positions and/or being directors of Aratana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Aratana to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Aratana and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

209.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Aratana.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: August 7, 2017

                                                        Respectfully submitted,

                                                        **LEVI & KORSINSKY, LLP**

                                                        _____
                                                        Shannon L. Hopkins
                                                        733 Summer Street, Suite 304
                                                        Stamford, CT 06901
                                                        Tel: (203) 992-4523
                                                        Facsimile: (212) 363-7171
                                                        Email: shopkins@zlk.com

                                                        *Attorneys for Plaintiff*